**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 13-4895**

———————————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

    v.

ABUKAR OSMAN BEYLE,

                Defendant - Appellant.

———————————

**No. 13-4897**

———————————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

    v.

SHANI NURANI SHIEKH ABRAR,

                Defendant - Appellant.

———————————

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca Beach Smith, Chief District Judge. (2:11-cr-00034-RBS-DEM-2; 2:11-cr-00034-RBS-DEM-3)

———————————

Argued: January 29, 2015          Decided: April 3, 2015

———————————

Before WILKINSON, GREGORY, and SHEDD, Circuit Judges.

———————————

Affirmed by published opinion.  Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Shedd joined.

---

**ARGUED:** James Ellenson, LAW OFFICE OF JAMES STEPHEN ELLENSON, Newport News, Virginia; Lawrence Hunter Woodward, Jr., SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellants.  Benjamin L.  Hatch, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, Joseph E. DePadilla, Assistant United States Attorney, Norfolk, Virginia, Brian J. Samuels, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

---

WILKINSON, Circuit Judge:

Appellants Abukar Osman Beyle and Shani Nurani Shiekh Abrar were each convicted on twenty-six criminal counts arising from the armed abduction and murder of four U.S. citizens off the coast of Somalia. Beyle and Abrar were part of a group of nineteen pirates who seized a yacht and captured the four Americans on board. The pirates headed for Somalia, but were intercepted by the United States Navy. During a final confrontation with the Navy, Beyle, Abrar, and another pirate shot and killed the four American hostages. The Navy secured the boat and apprehended the surviving pirates, who were transported to the United States to face criminal charges. After a weeks-long trial, a jury convicted Beyle and Abrar on all counts, and each defendant received multiple life sentences.

Beyle and Abrar now challenge their respective convictions on separate grounds. Beyle argues that the district court lacked jurisdiction over the murder and firearms charges against him because the Americans were not killed on the "high seas." Abrar, who maintains that he was kidnapped before the piracy operation, contends that he was unable to present certain witnesses who could have corroborated his duress defense. We conclude, however, that the site of the murders, thirty to forty nautical miles from the Somali coast, lay on the high seas and thus beyond the territorial sea of any nation. We further conclude

3

that Abrar was not denied his Fifth Amendment right to due process or his Sixth Amendment right to present witnesses material to his defense. The district court gave each of the defendants the fair trial that he deserved, and we affirm in all respects its judgment.

## I.

In reviewing defendants' convictions by a jury, we consider the evidence in the light most favorable to the government. Evans v. United States, 504 U.S. 255, 257 (1992); see United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (en banc).

## A.

The United States and its allies are engaged in a multinational battle against piracy in the waters off the Horn of Africa. Through the Gulf of Aden and much of the Indian Ocean, Somalia-based pirates have launched attacks against commercial and recreational vessels, from large freighters to personal yachts. See The White House, United States Counter Piracy and Maritime Security Action Plan annex A at 1 (June 2014); U.N. S.C. Rep. of the Sec'y-Gen. on the Situation with Respect to Piracy and Armed Robbery at Sea off the Coast of Somalia, U.N. Doc. S/2014/740 (Oct. 16, 2014). Piracy poses a threat not only to the free flow of global commerce, but also to

4

the individuals who navigate the seas. In 2011, armed Somali pirates attacked an estimated 3,863 seafarers and took some 555 individuals hostage. Oceans Beyond Piracy et al., The Human Cost of Maritime Piracy, 2012, at 3 (2013). Thirty-five of those hostages were killed. Id. at 7.

This case arises from one such attack. In early February 2011, a group of pirates, with the assistance of several investors and facilitators in Somalia, prepared to hijack a ship at sea. The investors provided a primary "mothership" for the voyage, as well as an attack skiff that the pirates would use to launch fast-moving assaults on their targets. The mothership, the Alqasim, was a captured Yemeni fishing boat, and four Yemeni fishermen on board were forced to operate the boat for the pirates. All of the pirates were Somali, except for one, another Yemeni fisherman who had been captured by Somali pirates but then decided to join their ranks. Among their supplies, the nineteen men brought various automatic firearms and a rocket-propelled grenade launcher.

Beyle and Abrar were part of this cohort. Beyle assisted with acquiring an outboard motor for the attack skiff. Abrar brought an AK-47 aboard the boat. One of the pirates drew up a list of the individuals who had participated in the mission, to allocate any eventual ransom shares. Both Beyle and Abrar were

5

on the list. The four captive Yemeni fishermen from the Alqasim were not.

The pirates set to sea on February 9, 2011. During their first nine days, they made a number of unsuccessful efforts, including chasing a large container ship. In at least one such attempt, Abrar carried the rocket-propelled grenade launcher.

On February 18, 2011, the pirates spotted a new target: a U.S.-flagged sailboat with four U.S. citizens aboard. The Americans had been sailing in the Arabian Sea as part of an international yacht rally, traveling a leg from India to Oman. Two of them, Scott Adam and Jean Adam, were husband and wife and owned this vessel, known as the Quest. The other two Americans were Phyllis Macay and Robert Riggle, who were friends of the couple.

Six of the pirates, including Beyle and Abrar, boarded the attack skiff. They moved swiftly to hijack the Quest and take the four Americans hostage. As the skiff approached, Beyle fired an AK-47 into the air. Once on board, Abrar first subdued the two women, and he then cut the boat's communication lines. At the time the pirates gained control, the nearest land was Oman or Yemen, approximately four hundred miles away. The pirates had traveled 940 to 960 miles from the Somali coast.

With the Quest secured, the remaining pirates took the supplies from the mothership and crowded onto the fifty-eight-

foot-long Quest. They released the four Yemeni captives, who departed in the Alqasim. The nineteen pirates then set a course for Somalia. They intended to hold the Americans hostage on land and work through their coconspirators to secure a ransom.[1] The Americans were kept primarily in a horseshoe-shaped bench area around the helm. Beyle and Abrar were among the men assigned to guard the Americans, with guns ready. After hijacking the Quest, the pirates also used the Americans' cellular telephones to take photographs and record videos. Several pirates put on clothing belonging to their victims, and Abrar can be seen wearing a hostage's sunglasses and smiling.

The U.S. Navy was soon alerted to the attack, and a carrier strike group moved to intercept the Quest. After locating the boat, which was still hundreds of miles into the Indian Ocean, the Navy established radio communications with the pirates and began following the Quest as it proceeded to Somalia. The Navy's objective was to stop the Quest from entering Somali territorial waters and to secure the hostages' safe release. Claiming they lacked any negotiating authority, however, the pirates demanded that they be allowed to reach Somalia and engage in hostage negotiations through an interlocutor on land. The Navy made

---

[1] The pirates' English-speaking negotiator in Somalia was later captured and convicted in a separate proceeding. We affirmed those convictions. United States v. Shibin, 722 F.3d 233 (4th Cir. 2013).

7

clear to the pirates that they would not be permitted to take the hostages to Somalia. But time was running short: the pirates were on pace to reach Somalia within days. At one point during these exchanges, Abrar fired an AK-47 into the air above Scott Adam, as a warning to the Navy. The pirates variously threatened to kill the hostages and themselves.

On February 22, 2011, the Navy directed the pirates to stop proceeding toward Somalia. The Navy was determined to keep the Quest in international waters and prevent it from entering Somali territorial waters. But the pirates refused. The Navy began maneuvering to block the boat and informed the pirates that these movements were peaceful. One pirate answered, "I will eat them like meat." J.A. 384.

Suddenly, another pirate fired a rocket-propelled grenade toward the USS Sterett, the Navy destroyer that had been following the Quest most closely. The rocket missed and splashed into the water, between the Sterett and a set of smaller boats carrying Navy SEALs. Bullets from the Quest began whizzing over the Sterett, but the Navy did not return fire. At that point, a group of three pirates -- Beyle and Abrar, together with Ahmed Muse Salad, also known as "Afmagalo" -- fired their automatic weapons and killed the four Americans. Scott Adam was shot seven times; Jean Adam was shot seven times; Phyllis Macay was shot eight times; Robert Riggle was shot nineteen times. At the time

8

of these events, it is undisputed the Quest was between thirty and forty nautical miles off the coast of Somalia.

Within a matter of minutes, a team of Navy SEALs headed for the Quest, boarded it, and secured it. By the time the SEALs arrived, all four Americans had been mortally wounded. Many pirates, including Beyle and Abrar, put their hands up and surrendered. The other shooter, Afmagalo, was the last to surrender. At the end of the encounter, four of the pirates were dead: two from the discharge of the pirates' own weapons, and two from the SEALs' raid.

The Navy took the remaining pirates into custody. While held aboard the USS Enterprise, an aircraft carrier, they were given Miranda warnings and questioned by the FBI. (One pirate, a juvenile, was released.) Abrar told the FBI that he had been forced to participate in the piracy mission. In Abrar's account, he was offered work as a mechanic in the coastal Somali town of Garacad, but was then kidnapped at gunpoint by two of the other pirates, Mohamud Salad Ali, also known as "Juguuf," and Mohamud Hirs Issa Ali, also known as "Sarindaaq." Abrar acknowledged that he had been the first pirate to board the Quest, and he contended that after the hijacking his role changed from mechanic to guard. According to Abrar, he did not leave with the four Yemeni fishermen who were released on the Alqasim because he thought he would have been arrested in Yemen for piracy.

9

Although Abrar admitted that he had been pointing a gun at Jean Adam before the concluding moments of carnage, he denied ever shooting any of the American hostages. Abrar, who is considered a member of the Bantu minority ethnic group in Somalia, claimed that he would not have received a share of any ransom. When confronted with the pirates' list of participants, Abrar suggested that his name may have been included simply to assuage his feelings.

## B.

The fourteen remaining pirates, including Beyle and Abrar, were transported to the United States for criminal prosecution. A federal grand jury returned a three-count indictment against the pirates. Nine members of the group pleaded guilty to piracy under the law of nations, and two leaders, Sarindaaq and Juguuf, pleaded guilty both to piracy under the law of nations and to hostage-taking resulting in death. Each of the eleven pirates who entered guilty pleas was sentenced to at least one term of life imprisonment.

On July 8, 2011, the grand jury returned a superseding indictment containing twenty-six counts against each of the three pirates who had not pleaded guilty -- Afmagalo, Beyle, and Abrar. The superseding indictment charged the codefendants with the following crimes: conspiracy to commit hostage-taking

10

resulting in death, in violation of 18 U.S.C. § 1203(a) (Count 1); hostage-taking resulting in death, in violation of 18 U.S.C. § 1203(a) and § 2 (Counts 2, 3, 4, and 5); conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) (Count 6); kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(2) and § 2 (Counts 7, 8, 9, and 10); conspiracy to commit violence against maritime navigation resulting in death, in violation of 18 U.S.C. § 2280(a)(1)(H) (Count 11); violence against maritime navigation resulting in death, in violation of 18 U.S.C. § 2280(a)(1)(G) and § 2 (Counts 12, 13, 14, and 15); murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111 and § 2 (Counts 16, 17, 18, and 19); piracy under the law of nations, in violation of 18 U.S.C. § 1651 and § 2 (Count 20); the use, carry, brandish, and discharge of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) and § 2 (Counts 21 and 26); the use, carry, brandish, and discharge of a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. § 924(c) and (j) and § 2 (Counts 22, 23, 24, and 25). The superseding indictment also included the requisite notice of special findings for seeking capital punishment, and nine months later the government filed notices of its intent to seek the death penalty against Afmagalo, Beyle, and Abrar.

Beyle and Abrar each filed pre-trial motions to dismiss. First, Beyle moved to dismiss Counts 16 through 19 and Counts 22 through 25 on the ground that the murders had taken place in Somali territorial waters, beyond U.S. jurisdiction. The district court denied the motion in a memorandum order. Second, Abrar moved to dismiss the indictment based on his inability to investigate or corroborate a duress defense. Abrar identified various witnesses located overseas -- several individuals in Somalia, as well as the four Yemeni fishermen from the Alqasim -- who he believed could provide meaningful character evidence to support his claim that he had been forced to join the piracy operation. The district court denied this motion as well.

The guilt phase of the codefendants' capital trial, which lasted from June 4 to July 8, 2013, featured extensive testimony from U.S. officials and from many of the pirates. The court issued a jury instruction on Abrar's duress defense for Counts 1 through 15 and Count 20 -- that is, for all the counts besides the murders and the various firearms offenses.

At the conclusion of the guilt phase of the trial, the jury convicted Afmagalo, Beyle, and Abrar on all twenty-six counts. The jury recommended sentences of life imprisonment. The district court eventually sentenced each of the codefendants to three concurrent life sentences, plus eighteen consecutive life sentences and thirty consecutive years.

12

Beyle and Abrar now appeal. Each argues his claim independently, and neither purports to join the other's grounds. The third convicted codefendant, Afmagalo, is not a party to this appeal.

## II.

Beyle contends that the district court lacked jurisdiction over the charges of murder (Counts 16, 17, 18, and 19) and concomitant use of a firearm (Counts 22, 23, 24, and 25) because the underlying actions occurred within Somalia's territorial waters, not on the high seas. For many reasons, we find Beyle's claims unpersuasive.

## A.

The Constitution grants Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas." U.S. Const. art. I, § 8, cl. 10. Congress has exercised this enumerated power to punish maritime crimes since the earliest days of the Republic. United States v. Dire, 680 F.3d 446, 455-56 (4th Cir. 2012) (discussing criminal piracy statutes from 1790 and 1819 and associated litigation).

The statutes under which Beyle was convicted fall well within Congress's constitutionally granted power to punish felonies on the high seas. The first statute proscribes murder

"[w]ithin the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b). The second statute defines the "special maritime and territorial jurisdiction of the United States" as including the "high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State," and "[a]ny place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States." Id. § 7(1), (7). Finally, the statutory prohibition of the use of a firearm to cause the death of another tacks onto the underlying offense. Id. § 924(c), (j). Congress undoubtedly possesses the authority under the Define and Punish Clause to enact the criminal laws at issue in Beyle's appeal.

That said, the crux of Beyle's argument is not that the statutes under which he was convicted are facially unconstitutional, but rather that he was not on the high seas when he committed the actions for which he is to be punished. He asserts that the district court "mistakenly construed the law regarding the limits of the territorial seas" of Somalia. Appellants' Br. at 6. Beyle's appeal thus presents a single issue: is a person thirty to forty nautical miles off the Somali coast on the "high seas"? We review this question of law de novo. United States v. Woolfolk, 399 F.3d 590, 594 (4th Cir. 2005).

14

B.

It is well-settled that the "high seas" encompass all those waters beyond the boundary of the various territorial waters. Simply put, "[o]utside the territorial sea are the high seas." United States v. Louisiana, 394 U.S. 11, 23 (1969); see also Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1667 (2013) ("Piracy typically occurs on the high seas, beyond the territorial jurisdiction of the United States or any other country."); United States v. Rodgers, 150 U.S. 249, 259 (1893) ("[A] large body of navigable water[,] . . . open and unconfined, and not under the exclusive control of any one nation or people, . . . must fall under the definition of 'high seas'" . . . .). As we have noted, "beyond the territorial waters lie the high seas, over which no nation can exercise sovereignty." R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 965 (4th Cir. 1999).

Customary international law supports this definition. Two international agreements are most relevant to the case at hand. First, the 1958 Geneva Convention on the High Seas, which the United States has ratified, defines "high seas" as "all parts of the sea that are not included in the territorial sea or in the internal waters of a State." Convention on the High Seas art. 1, opened for signature Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82 (entered into force Sept. 30, 1962). Second, the United

15

Nations Convention on the Law of the Sea ("UNCLOS") states that a nation's sovereignty covers only "the territorial sea." U.N. Convention on the Law of the Sea art. 2, opened for signature Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994). Although the United States has not signed or ratified UNCLOS, it "has recognized that [the treaty's] baseline provisions reflect customary international law." United States v. Alaska, 503 U.S. 569, 588 n.10 (1992) (internal quotation marks omitted); Dire, 680 F.3d at 459; Statement on United States Oceans Policy, 1983 Pub. Papers 378, 379 (Mar. 10, 1983) ("[T]he United States is prepared to accept and act in accordance with the balance of interests relating to traditional use of the oceans . . . .").

UNCLOS recognizes an exclusive economic zone ("EEZ") beyond a nation's territorial sea but within two hundred nautical miles of the coastal baseline. See UNCLOS, supra, arts. 55-59. Beyle insists that UNCLOS treats the EEZ as a distinct quasi-territorial entity and that the high seas do not begin until two hundred nautical miles from land. Because the Quest was within the EEZ when the murders occurred, he thus asserts that he was not on the "high seas" for the purposes of U.S. law.

While it is true that the part of UNCLOS that is titled "High Seas" concerns the waters extending beyond the borders of the EEZ, see UNCLOS, supra, art. 86, almost all of the treaty's

16

high-seas provisions apply with equal force inside the EEZ as they do outside it, see id. art. 58(1)-(2). The EEZ bordering a particular nation's territorial sea is merely a part of the high seas where that nation has special economic rights and jurisdiction. UNCLOS grants coastal nations certain rights to natural resources within the EEZ, as well as jurisdiction over marine scientific research and protection and preservation of the marine environment. Id. art. 56(1)(a), (b); see also Titanic, 171 F.3d at 965 n.3 (noting that the EEZ grants "exclusive control over [certain] economic matters . . . , but not over navigation").

Any allocation of economic rights, however, is a far cry from conferring on a nation the exclusive authority endemic to sovereignty to define and punish criminal violations. In effect, Beyle would have us use UNCLOS's grant of certain specific enumerated rights as a wedge to dramatically expand Somalia's plenary control past the twelve-nautical-mile maximum. But Beyle points to no court that has declared that a nation's full sovereign rights extend two hundred nautical miles from the coast. We decline to credit such a sweeping interpretation.

C.

If Beyle was beyond the bounds of Somalia's territorial sea, therefore, he was on the high seas and within the reach of

17

the U.S. criminal statutes under which he was convicted. The question then becomes where exactly Somalia's territorial sea ends and the high seas begin. The weight of authority points to an outer territorial limit of twelve nautical miles, which places the Quest on the high seas at the time of the murders.

UNCLOS explicitly restricts territorial seas from extending farther than twelve nautical miles from national coastlines. UNCLOS, supra, art. 3. At the time of the piracy at issue in this case, 161 nations had ratified UNCLOS, including Somalia. With nearly 170 signatory nations today, UNCLOS enjoys widespread acceptance in the international community. As noted above, although the United States is not a signatory to UNCLOS, this country recognizes the treaty's place as an accurate reflection of customary international law. It is, moreover, the policy of the United States not to respect claims that a territorial sea extends beyond twelve nautical miles. Office of Ocean Affairs, U.S. Dep't of State, Pub. No. 112, Limits in the Seas: United States Responses to Excessive Maritime Claims 7, 33 (1992); Fact Sheet, Office of the Press Sec'y, The White House, United States Oceans Policy (Mar. 10, 1983); see 33 C.F.R. § 2.22(b); see also The White House, United States Counter Piracy and Maritime Security Action Plan annex B at 2 (June 2014). Consistent with UNCLOS, the United States itself claims a territorial sea extending up to twelve nautical miles. 18 U.S.C.

18

§ 2280(e); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 441 n.8 (1989); 33 C.F.R. § 2.22(a)(1)(ii), (iii), (iv) (applying a U.S. territorial sea of twelve nautical miles for determining U.S. criminal jurisdiction and the special maritime and territorial jurisdiction, and for interpreting international law); Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988) (extending the U.S. territorial sea to twelve nautical miles "in accordance with international law").

We, too, have repeatedly stated that a nation's territorial waters generally extend to twelve nautical miles. See United States v. Shibin, 722 F.3d 233, 239 (4th Cir. 2013); Dire, 680 F.3d at 460 n.11; Titanic, 171 F.3d at 965. The jury instructions given by the district court reflected this understanding, and earlier cases were predicated upon the same definition. J.A. 2704 ("The 'high seas' include areas of the seas that are outside the territorial seas of any nation. A nation's territorial seas are generally limited to an area within 12 nautical miles of the nation's coast."); see, e.g., Excerpt of Proceedings (Jury Instructions) at 19-20, United States v. Hasan, No. 2:10-cr-56 (E.D. Va. Nov. 22, 2010) (same), ECF No. 356, aff'd sub nom. Dire, 680 F.3d 446.

Nevertheless, Beyle argues that customary international law does not apply to the determination of the extent of Somalia's territorial sea, because Somalia passed national legislation in

19

1972 that extended its sea to two hundred nautical miles.[2] Even if we could or would credit any such territorial claim, it does not pass muster here. Somalia ratified UNCLOS in 1989, making a clear international commitment to a territorial sea of no more than twelve nautical miles.[3] Furthermore, Somalia also has never submitted a declaration indicating non-adherence to any UNCLOS provision, and in any event UNCLOS prohibits signatories from opting out selectively from its provisions. UNCLOS, supra, art. 310. The United States, moreover, explicitly does not recognize

---

[2] The validity of the 1972 Somali domestic legislation is itself doubtful and unclear. In June 2014, Somalia's president issued a proclamation stating that the country's exclusive economic zone stretched for two hundred nautical miles, but made no claim that full sovereignty extended so far. See Proclamation by the President of the Federal Republic of Somalia (June 30, 2014), available at http://www.un.org/depts/los/LEGISLATIONANDTR EATIES/PDFFILES/SOM_2014_Proclamation.pdf. The following month, the country submitted an executive summary to the Commission on the Limits of the Continental Shelf, indicating in a table that a twelve-nautical-mile territorial claim existed, consistent with UNCLOS. See Continental Shelf Submission of the Federal Republic of Somalia: Executive Summary 7 (July 21, 2014), available at http://www.un.org/depts/los/clcs_new/submissions_files/som74_14 /Somalia_Executive_Summary_2014.pdf.

[3] We recognize that ratification of an international treaty that is not self-executing typically does not supersede inconsistent domestic law in a country that requires separate implementing legislation. See Medellin v. Texas, 552 U.S. 491, 504-05 (2008) (discussing treaties that are not self-executing in the context of U.S. law). Here, however, we need not decide whether the UNCLOS provision is self-executing. Even if it is not, the district court was justified in relying on Somalia's unequivocal international commitment, as embodied in its ratification of UNCLOS, and indeed in this case Somalia's own treaty implementation procedures are opaque and the status of its inconsistent domestic legislation is itself ambiguous.

any claim by Somalia to a two-hundred-nautical-mile territorial sea and has conducted operations well within the two-hundred-nautical-mile limit to make that policy known. Office of the Judge Advocate Gen., U.S. Navy, Maritime Claims Reference Manual: Somalia (2014). Indeed, the Navy maneuvered to block the Quest where it did precisely because it did not want the pirated vessel to sail into the twelve-nautical-mile territorial sea.

"The common and obvious meaning of the expression, 'high seas,' is also the true legal meaning," Daniel Webster once argued before the Supreme Court. United States v. Bevans, 16 U.S. (3 Wheat.) 336, 341 (1818). "The expression describes the open ocean, where the dominion of the winds and waves prevails without check or control." Id. Although Webster was not conversant with UNCLOS, he plainly grasped the point that expansive claims of territoriality would intrude upon the natural domain of the seas and the multinational interests therein. Nowhere is this truer than when litigants seek to extend customary international law as memorialized in treaties to claim territorial seas more than sixteen times the maximum breadth. The Quest, Beyle, and the victims were on the high seas when the murders occurred.

D.

We are aware of no court that has held that Somalia's territorial sea extends past the twelve-nautical-mile boundary prescribed by UNCLOS, much less to two hundred nautical miles. We shall not be the first.

Piracy is an international problem. The primary anti-piracy statute in our criminal code, 18 U.S.C. § 1651, "incorporates" the "definition of piracy" under international law. Dire, 680 F.3d at 469. An essential element of the international crime of piracy is that the violence against persons, vessels, or property occurred "on the high seas" or "outside the jurisdiction of any" nation. UNCLOS, supra, art. 101(a)(i)-(ii); see Shibin, 722 F.3d at 240-44; Dire, 680 F.3d at 465. In a reflection of that shared understanding, it has fallen to U.S. and North Atlantic Treaty Organization ("NATO") coalition forces to combat Somalia-based piracy. These naval forces conduct patrols in the Gulf of Aden, a vital shipping passageway between the Arabian Peninsula and the Horn of Africa. Parts of the Gulf of Aden off the Somali coast are under two hundred nautical miles wide. In essence, Beyle asks this court to treat the Gulf of Aden as a Somali territorial sea. As a practical matter, such a ruling would prove especially problematic for NATO maritime forces, which only operate in Somali territorial waters under

22

the consent of Somali authorities. Fact Sheet, Mar. Command, N. Atl. Treaty Org., Operation Ocean Shield, at 2 (Nov. 2014).

The risks of an extension of the Somali territorial sea include as well emboldened gangs of pirates, increased "investment" in piracy by Somalia-based financiers, and bridled NATO and multinational counter-piracy efforts. Such results would offend the United Nations Security Council's ongoing apprehension over the threat "to international navigation, the safety of commercial maritime routes and the safety of seafarers and other persons" posed by the violence of piracy and hostage-taking. S.C. Res. 1976, preambular ¶ 2, U.N. Doc. S/RES/1976 (Apr. 11, 2011). We decline to allow Beyle's challenge to his murder and firearm convictions to undermine this broader multinational effort.

In short, the structure of domestic and international law that Beyle seeks to topple protects commercial peace against piratical disruption, and we reject his challenge to his murder and firearms convictions.

III.

Abrar argues that he was denied his Fifth Amendment right to due process and his Sixth Amendment right to present witnesses material to his duress defense. In particular, he maintains that he was unable to access or subpoena certain

23

witnesses located abroad who could have corroborated his story that he had been kidnapped and forced to work as a pirate. Even though he concedes that duress is not a valid defense to the murder counts, he requests dismissal of the entire indictment as the "only remedy." Appellants' Br. at 30. We disagree with Abrar's contentions. The district court properly denied his motion to dismiss the indictment.

A.

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The right to due process "is, in essence, the right to a fair opportunity to defend against the [government's] accusations." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. This right is violated when the defendant is "arbitrarily deprived of 'testimony [that] would have been relevant and material, and . . . vital to the defense.'" United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (alterations in original) (quoting Washington v. Texas, 388 U.S. 14, 16 (1967)). Fifth Amendment due process and Sixth Amendment compulsory process are

24

closely related, for the right "to call witnesses in one's own behalf ha[s] long been recognized as essential to due process." Chambers, 410 U.S. at 294; see also Washington, 388 U.S. at 19. At root, then, we are asked to determine whether one of the "elements of a fair trial" was absent in the proceedings below. Chambers, 410 U.S. at 295.

A criminal defendant's right to compulsory process is not unlimited. "Few rights," to be sure, "are more fundamental than that of an accused to present witnesses in his own defense," Id. at 302, and the right to compulsory process is "imperative to the function of courts" in our adversary system, United States v. Nixon, 418 U.S. 683, 709 (1974). But the right to compulsory process does not scorn practicality. Crucially, "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses." Valenzuela-Bernal, 458 U.S. at 867 (emphasis added). In concrete terms, the right to compulsory process is "circumscribed . . . by the ability of the district court to obtain the presence of a witness through service of process." United States v. Moussaoui, 382 F.3d 453, 463 (4th Cir. 2004).

Those practical limits are significant for the transnational context in which Abrar's claims arise. It is a "well[-]established and undisputed principle that the process power of the district court does not extend to foreign nationals

25

abroad." Id. at 463-64. A conviction does not become unconstitutional simply because the federal courts lack power to secure the appearance of a foreign national located outside the United States. Id.; United States v. Theresius Filippi, 918 F.2d 244, 246 n.2 (1st Cir. 1990); United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th Cir. 1988); United States v. Greco, 298 F.2d 247, 251 (2d Cir. 1962); see also 28 U.S.C. § 1783(a) (providing for subpoenas of "a national or resident of the United States who is in a foreign country," but not referencing foreign nationals abroad); Fed. R. Crim. P. 17(e)(2). After all, "the Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it." Greco, 298 F.2d at 251.

All of the witnesses proffered by Abrar are foreign nationals located abroad. In his pretrial motion, Abrar named five individuals in Somalia, including a former landlord, his brother-in-law, and others who he believed could testify about his prior work as a driver or mechanic. He also wished to call the four Yemeni fishermen from the Alqasim, although he did not know their full names or their precise whereabouts. When Abrar renewed his motion at trial, his counsel identified two prospective witnesses for his duress defense, a shopkeeper and a garage manager in the Somali town of Garacad. All of those individuals are foreign nationals located outside the United

26

States, and as such they lay beyond the subpoena power of the district court.

Abrar's inability to access the proffered witnesses arose primarily from the security situation in Somalia -- a matter beyond the control of the U.S. government. See Security and Governance in Somalia: Consolidating Gains, Confronting Challenges, and Charting the Path Forward: Hearing Before the Subcomm. on Afr. Affairs of the S. Comm. on Foreign Relations, 113th Cong. (2013); U.N. S.C. Rep. of the Sec'y-Gen. on Somalia, U.N. Doc. S/2014/699 (Sept. 25, 2014). The investigators who had traveled to Somalia on Abrar's behalf had been unable to leave the capital city of Mogadishu because of ongoing security threats. The domestic troubles within Somalia may complicate independent investigations or a potential service of process, but such exogenous difficulties need not halt the operations of the criminal justice system in the United States. This is especially the case where the immediate obstacles are not of the government's making.

Significantly, we do not even know whether the witnesses proffered by Abrar actually exist. During their visit to Mogadishu, Abrar's investigators apparently did contact some of Abrar's family members, but failed to obtain the cooperation of any witnesses. They did not even speak with the shopkeeper or the garage manager -- the two witnesses identified at trial by

27

Abrar's counsel as "key" to his duress defense. J.A. 2364. Even if the district court were to direct individuals to travel through the dangerous conditions in Somalia to try to serve subpoenas on Abrar's proffered witnesses, it is uncertain how long such an effort would take or whether it would be fruitful. This is especially the case where the witnesses may be fictitious.

We owe substantial deference to the district court for these kinds of evidentiary determinations, and we review such decisions for abuse of discretion. United States v. Medford, 661 F.3d 746, 751 (4th Cir. 2011). After all, the district court has a bird's-eye view of the trial, knowledge of the intricacies of the case, and a sense of the context and background in which each evidentiary claim arises.

B.

Abrar cannot establish a constitutional violation from the "mere absence" of his proffered witnesses' testimony. Valenzuela-Bernal, 458 U.S. at 867. It is further doubtful that "their testimony would have been both material and favorable to his defense." Id. (emphasis added). The anticipated testimony of Abrar's proffered witnesses was relatively far afield: it would have consisted primarily of broad references to his activities before the events at issue in this case. According to Abrar's

own submission, the testimony would have pertained to his "trade as a mechanic and driver, his character for peacefulness, and the series of events leading up to his detainment by the other pirates." J.A. 121. Conceivably, the testimony may also have covered the discrimination Abrar confronted as a Bantu, although several of the pirates called by the government and other witnesses called by the defense did discuss that issue at trial. Critically, however, the proffered testimony would not directly substantiate Abrar's story that he was kidnapped at gunpoint by Juguuf and Sarindaaq, nor would it concern the events aboard the Quest or his relationship with the other pirates.

It is unclear -- indeed doubtful -- that such oblique testimony would be material to Abrar's duress defense. The testimony adduced at trial painted a deeply incriminating portrait of Abrar. Several of the other pirates testified that Abrar was a willing participant. Like all the other Somalia-based pirates who had boarded the Alqasim, including the one of Yemeni origin -- and unlike the four captive Yemeni fishermen who were released after the hijacking of the Quest -- Abrar would have received a share of any ransom. Abrar brought an AK-47 to the operation and, during at least one of the initial unsuccessful attacks, carried the rocket-propelled grenade launcher. He was the first pirate to board the Quest, and he promptly took control of the two American women and cut the

29

boat's communications lines. He stood guard over the hostages and had his gun trained on Jean Adam before the fatal shots were fired. From its viewing of the video evidence, the district court told Abrar at sentencing that, "if one were concluding, you were probably the shooter of Jean Adam." J.A. 3596. In that light, it is hard to imagine how testimony about Abrar's prior professional work could have been material to the determination of his guilt or punishment.

Despite the powerful evidence marshaled against him at trial, Abrar did not try to take advantage of the other sources available to him. The government represents that, in other piracy prosecutions in the Eastern District of Virginia, it has worked with defense counsel to develop various evidentiary accommodations for defendants, which might include testimony by telephone, depositions, and stipulations. Appellee's Br. at 52-53. Notably, Abrar also did not elicit testimony about his abduction from his two alleged kidnappers. Juguuf and Sarindaaq were in federal custody with the other pirates who had already pleaded guilty, and the government offered to make either of them available to testify on this point. But Abrar's counsel declined the offer. He informed the court that he had spoken with Juguuf and Sarindaaq and knew that both would deny Abrar's story. While Abrar was certainly free to structure his defense as he thought best, his failure to adduce any direct evidence of

30

his story or to counter effectively the overwhelming case against him undermines whatever vague advantage he sought to gain from elusive overseas witnesses.

## C.

In the proceedings below, the district court gave Abrar multiple opportunities to develop his duress argument. Of course, as a criminal defendant, Abrar was entitled not to take the stand. U.S. Const. amend. V. Had he chosen to testify, however, Abrar generally would have been subject to the same evidentiary rules as other witnesses. Portuondo v. Agard, 529 U.S. 61, 69 (2000). In particular, the government would have been allowed to attack his credibility on cross-examination. Fed. R. Evid. 608(a), 611(b). The district court, though, was prepared to make an exception: if Abrar took the stand and his counsel asked only about the facts surrounding his duress defense, the district court would limit the government's cross-examination of Abrar to that issue. But Abrar elected not to testify even in that controlled capacity. In addition, the court ultimately instructed the jury on Abrar's duress defense for most of the counts, despite the absence of significant evidentiary support. Although the government objected to this instruction below, it bears note that, even with a duress

31

instruction, the jury proceeded to convict Abrar on all twenty-six counts charged in the indictment.

Despite the opportunities afforded to Abrar, the weight of the evidence against him was simply overwhelming -- and virtually uncontroverted. The district court ably presided over a twenty-eight-day jury trial spanning nearly two months and "watched every video and heard every piece of evidence." J.A. 3597. In the final analysis, the court's view of the matter was clear:

> Four people were murdered, and they were murdered in a particularly heinous manner. The whole process of the conspiracy and the kidnapping was horrendous. . . . Frankly, you looked like you were having a good time at certain instances. I would challenge anyone to sit and look at all of these videos and any of these pictures and come to any conclusion other than you were a willing participant . . . . [N]one of the evidence, when you put it together, meets common sense of you being under duress. . . . You were a major player and you were a major shooter, and there is no question in my mind.

J.A. 3595-97. From all the evidence adduced at trial and the inferences that might have been drawn from it, the court concluded, Abrar's claim of duress "defie[d] . . . credibility." J.A. 3597. We see no reason to disturb the jury's and the court's assessments, much less to invoke the extraordinary remedy of dismissing the indictment. We thus affirm the district court's denial of Abrar's motion.

32

IV.

For the foregoing reasons, the judgment is affirmed.

<u>AFFIRMED</u>