**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-4039**

───────────

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

     v.

JESSE FERNANDO PEREZ,

             Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Roderick Charles Young, District Judge. (3:23-cr-00019-RCY-1)

───────────

Argued:  December 13, 2024                    Decided:  August 12, 2025

───────────

Before WYNN, HARRIS, and QUATTLEBAUM, Circuit Judges.

───────────

Vacated and remanded by published opinion. Judge Quattlebaum wrote the opinion in which Judge Wynn joined. Judge Wynn wrote a concurring opinion. Judge Harris wrote an opinion concurring in part and dissenting in part.

───────────

**ARGUED:** Joseph Stephen Camden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant.  William Connor Winn, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, Frances H. Pratt, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Nicole M. Argentieri, Principal Deputy Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Angelica Carrasco-Riley, Child Exploitation & Obscenity Section, Criminal Division, UNITED STATES

2

DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, Richmond, Virginia, Jacqueline R. Bechara, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

QUATTLEBAUM, Circuit Judge:

To convict a defendant of producing and possessing obscene visual depictions of the sexual abuse of children in violation of 18 U.S.C. § 1466A(a)(1) and (b)(1), the government must establish the jurisdictional element of the offense—here, that the offense was committed within the special territorial jurisdiction of the United States. 18 U.S.C. § 1466A(d)(5). That jurisdictional element asks two questions: (1) where did the defendant commit the offense; and (2) was that location within the special territorial jurisdiction of the United States? In this appeal, we decide who must resolve the second question. Does the factfinder—normally the jury, but the court in a bench trial—or the court decide whether the location of the offense was within the special territorial jurisdiction of the United States?

After a bench trial, the district court convicted Jesse Perez of producing and possessing child pornography in violation of 18 U.S.C. § 1466A at the Federal Correctional Institution in Petersburg, Virginia. The district court determined Perez "committed [his offense] in the special maritime and territorial jurisdiction of the United States" because FCI Petersburg is within federal territorial jurisdiction. 18 U.S.C. § 1466A(d)(5). Perez appeals, arguing the government must prove FCI Petersburg's jurisdictional status to the factfinder. He believes the underlying facts needed to determine FCI Petersburg's status are adjudicative in nature and, therefore, must be presented to the factfinder. And since the government failed to introduce evidence of FCI Petersburg's jurisdictional status at trial, Perez argues the government presented insufficient evidence to convict him.

3

We disagree. Perez concedes that the government proved the factual issue of where he committed the offense—FCI Petersburg. A location's jurisdictional status, on the other hand, is a legal issue. And because the facts informing jurisdictional status are legislative in nature, the court can notice them. So, we agree with the district court that while the location of Perez's crime is a question for the factfinder, the jurisdictional status of that location is a legal question for the court. But in considering that legal issue, the district court applied the wrong legal standard. As a result, we vacate the district court's judgment of conviction and remand for the district court to analyze FCI Petersburg's jurisdictional status consistent with this opinion.

## I. Factual and Procedural Background

In 2016, Jesse Perez pled guilty to possessing child pornography in violation of 18 U.S.C. § 2252A. *See* Minutes of Change of Plea, *United States v. Perez*, No. 2:15-cr-533 (C.D. Cal. April 14, 2016), ECF No. 29. The court sentenced him to a 121-month prison term. Soon afterwards, Perez arrived at FCI Petersburg.

While incarcerated there, Perez collected photos of children from books and magazines, drew genitalia and depictions of sexual acts on them and photocopied them so they "look[ed] almost real." J.A. 165. Perez masturbated to these images and wrote graphic stories about them. He kept the images and stories in a box in his cell.

During a routine contraband search of Perez's cell, correctional officers discovered the images and stories. Perez admitted to owning the images. And in a later interview with FBI agents, Perez admitted to making the images as well as writing the stories and masturbating to these materials.

4

A grand jury indicted Perez with producing and possessing obscene visual depictions of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(a)(1) and (b)(1). A violation of § 1466A must involve a jurisdictional "circumstance described in subsection (d)." *Id.* §§ 1466A(a), (b).

Subsection (d) lists five potential jurisdictional circumstances, including the use "of interstate or foreign commerce" to communicate, or "the offense is committed in the special maritime and territorial jurisdiction of the United States or in any territory or possession of the United States." *Id.* § 1466A(d)(1), (5). As relevant here, special maritime and territorial jurisdiction is defined in 18 U.S.C. § 7(3):

> Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

*See also* U.S. Const. art. I, § 8, cl. 17. For a property to fall within federal territorial jurisdiction: (1) the federal government must acquire the property "by purchase or condemnation"; (2) the state must consent to federal, or cede its own, jurisdiction; and (3) "the federal government itself must accept jurisdiction."[1] *United States v. Davis*, 726 F.3d 357, 363 (2d Cir. 2013). Property acquired before 1940 carries a presumption of federal acceptance, while property acquired after 1940 carries a presumption against federal

---

[1] Consent occurs when a state legislature authorizes federal acquisition of land within the state for the purposes mentioned in Article I, section 8, clause 17 of the Constitution. *See Paul v. United States*, 371 U.S. 245, 264 (1963). Cession occurs when the federal government acquires land without consent and the state subsequently cedes legislative authority. *See Kleppe v. New Mexico*, 426 U.S. 529, 542 (1976).

acceptance. *See* 40 U.S.C. § 3112 (formerly codified at 40 U.S.C. § 255); *Adams v. United States*, 319 U.S. 312, 313–14 (1943); *Markham v. United States*, 215 F.2d 56, 58 (4th Cir. 1954).

Perez waived his right to a jury trial. In closing arguments at his bench trial, Perez argued that the government failed to prove the required jurisdictional element. He claimed the government only introduced evidence of the photocopier document feeder's interstate commerce status, but not evidence of the photocopier's status. And he argued that the government failed to demonstrate its acceptance of territorial jurisdiction over FCI Petersburg. *See* 40 U.S.C. § 3112(c). In response, the government argued that it sufficiently proved the copier Perez used was an instrumentality of interstate commerce. It also argued that FCI Petersburg falls within federal territorial jurisdiction. The government pointed to testimony about the federal government's use of the prison to house federal inmates. And it argued that FCI Petersburg's jurisdictional status was ultimately "a legal question for the Court."[2] J.A. 123.

The district court found the government proved the substantive elements of Perez's § 1466A(a) and (b) offenses. Turning to the jurisdictional circumstances, the court rejected the interstate commerce basis for finding jurisdiction. It determined that the government

---

[2] Our dissenting colleague criticizes the government for putting on evidence of FCI Petersburg's jurisdictional status and then arguing on appeal that it is a legal question. *See, e.g.*, Diss. Op. at 36. Yet throughout the trial, the government took both paths—it offered evidence *and* repeatedly argued "the status of a place as within the 'special maritime and territorial jurisdiction of the United States' is a question of law for the Court." J.A. 19; *see also* J.A. 106, 123, 191–93. Particularly for an issue that is not totally settled, that's not changing horses in midstream; it's smart lawyering.

6

only showed the copier's document feeder—not the copier itself—traveled in interstate commerce, and the government failed to show Perez used the document feeder while committing the offense. But the district court explained that the jurisdictional element could still be established if the visual depiction involved in the offense was produced in the special maritime and territorial jurisdiction of the United States. The district court concluded that FCI Petersburg, where Perez produced the images, was within the special maritime and territorial jurisdiction of the United States because the federal government exercised practical usage and dominion over the prison. J.A. 127–28 (citing *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973)). Thus, the court found Perez guilty.

Perez subsequently moved for a judgment of acquittal, arguing that the government failed to sufficiently prove federal territorial jurisdiction over FCI Petersburg. The government opposed his motion, claiming the trial evidence sufficed and, alternatively, the district court could judicially notice FCI Petersburg's status. In its response, the government attached several letters dated in 1930 that reflect the Attorney General's selection of land outside Petersburg for a federal prison.

The district court denied Perez's motion. It explained that, as Perez conceded, trial evidence established his actions occurred at FCI Petersburg. The court then took "judicial notice that FCI Petersburg, a federal prison, falls under federal jurisdiction." J.A. 204. It explained "that the federal government exercises the sort of 'practical usage and dominion' over FCI Petersburg that the *Erdos* court contemplated." J.A. 205 (quoting *Erdos*, 474 F.2d at 159). Alternatively, the court concluded that the government proved at trial its "practical

7

usage and dominion" over FCI Petersburg. J.A. 207–08 (quoting *United States v. Blunt*, 558 F.2d 1245, 1247 (6th Cir. 1977)).

The district court sentenced Perez to 180 months' imprisonment. Perez timely appealed. During the pendency of the appeal, the government moved us to judicially notice roughly 300 pages of deeds, charts, government reports and Virginia statutes—not introduced at trial—that it argues establish FCI Petersburg's federal territorial jurisdictional status. *See* U.S. Motion for Jud. Notice, *United States v. Perez*, No. 24-4039 (4th Cir. Sept. 20, 2024), ECF No. 35-1. Perez opposed.[3]

## II. Analysis

Perez challenges the district court's determination of the federal territorial jurisdictional element. According to Perez, the underlying facts needed to determine FCI Petersburg's status are adjudicative in nature, so a court can only notice them under Federal Rule of Evidence 201(f) and must present them to a factfinder in a criminal case. Thus, Perez argues the government presented insufficient evidence at trial to convict him. To address Perez's appeal, we must first determine whether FCI Petersburg's jurisdictional status is a question for the factfinder or for the court.

---

[3] Perez's appeal presents us with Perez's judgment of conviction at his bench trial and the district court's denial of his post-trial motion for judgment of acquittal. We review "judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *United States v. Landersman*, 886 F.3d 393, 413 (4th Cir. 2018) (quoting *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016)). We review a denial of a motion for a judgment of acquittal *de novo*. *See United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). And we review a court's decision to take judicial notice for abuse of discretion. *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017).

## A.    Jurisdictional Status – Who Decides?

Perez's appeal requires us to answer *who* decides a location's jurisdictional status in a criminal case. According to Perez, the government must prove to the factfinder—beyond a reasonable doubt—that FCI Petersburg is within the special maritime and territorial jurisdiction of the United States. According to the government, it must only prove to the factfinder that Perez's conduct occurred at FCI Petersburg; the court decides whether FCI Petersburg is within federal territorial jurisdiction as a matter of law.

The government is correct. To be sure, the government must prove to the factfinder that the defendant committed the offense at a particular location. But that location's jurisdictional status is a legal question for the court. Related to that, the facts underlying that determination are legislative in nature. Thus, a court can judicially notice those facts to inform its legal determination about the jurisdictional status of a particular location.

### 1. Bifurcation of Jurisdictional Elements

Perez correctly notes that the jurisdictional element of a criminal statute "must be proved to a jury beyond a reasonable doubt." *Torres v. Lynch*, 578 U.S. 452, 467 (2016); *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (a jury must assess all facts that increase the range of penalties to which a criminal defendant is exposed). But he overreads that general proposition.[4] In *Taylor v. United States*, decided just one month after *Torres*,

---

[4] In fact, *Torres* did not involve any of the issues we confront today. Under the Immigration and Nationality Act, an alien convicted of an aggravated felony, as defined in 8 U.S.C. § 1101(a)(43), may be deported. *See* 8 U.S.C. § 1227(a)(2)(A)(iii); *Torres*, 578 U.S. at 455. A state crime that matches a listed felony in § 1101(a)(43) also constitutes an

9

the Supreme Court explained that criminal jurisdictional elements often contain an embedded legal component. 579 U.S. 301, 305, 308–09 (2016). The Court addressed a Hobbs Act robbery prosecution. *Id.* at 302. Under that statute, the government must show that a defendant "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . ." 18 U.S.C. § 1951(a). The Act defines "commerce" to include "commerce over which the United States has jurisdiction." *Id.* § 1951(b)(3). Taylor attempted two marijuana robberies, and the government successfully prosecuted him under the Hobbs Act. *Taylor*, 579 U.S. at 304–05. Before the Supreme Court, Taylor argued the government must prove beyond a reasonable doubt that the particular drugs in question, or the dealer who Taylor targeted, were in interstate commerce. *Id.* at 308. The Court rejected his argument. It held "[t]here is no question that the Government in a Hobbs Act prosecution must prove beyond a reasonable doubt that the defendant *engaged in conduct* that satisfies the Act's commerce element, but the *meaning of that element* is a question of law." *Id.* (emphasis added). The Court then imported its holding in *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) to conclude that marijuana robbery generally affects commerce within federal jurisdiction. *Taylor*, 579 U.S. at 303, 308. So, *Taylor* tells us a factfinder assesses, as a factual matter, whether the defendant

---

aggravated felony. *See Torres*, 578 U.S. at 455. The *Torres* Court considered whether a New York arson statute—which matched the federal arson statute in every element except it lacked the federal statute's jurisdictional element—constituted an aggravated felony. *Id.* at 456. And the Court concluded that a jurisdictional "element is properly ignored when determining if a state offense counts as an aggravated felony under § 1101(a)(43)." *Id.* at 473.

10

undertook activity "xyz." But a court determines whether activity "xyz" affects commerce.[5]

We have similarly approved of bifurcating a criminal jurisdictional element into a fact-conduct component and a legal-status component. In *United States v. Beyle*, we reviewed as a "question of law *de novo*" whether a yacht's location was on the "high seas"—and therefore within the "special maritime and territorial jurisdiction of the United States." 782 F.3d 159, 165–66 (4th Cir. 2015); *see* 18 U.S.C. § 7(1). There, pirates captured an American yacht and killed its passengers between thirty and forty nautical miles off the coast of Somalia. *Beyle*, 782 F.3d at 161–62. The government prosecuted the pirates for several crimes, including murder within federal territorial jurisdiction in violation of 18 U.S.C. § 1111(b). *Id.* at 164–65. The pirates argued the yacht was within Somalia's territorial seas and, therefore, outside the special territorial jurisdiction of the United States. After reviewing a treaty and Somali law, we rejected the pirates' argument, concluding the yacht's location was on the "high seas." *Id.* at 166–69. No one disputed the yacht's location was between thirty and forty miles off the Somali coast—an issue for the factfinder—but

---

[5] The Supreme Court's decision in *McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020) reflects the same approach as *Taylor*. Under the Major Crimes Act, certain enumerated offenses committed "within the Indian country" fall within the federal government's *exclusive* jurisdiction. 18 U.S.C. § 1153(a). Thus, state courts lack jurisdiction over such crimes. In *McGirt*, the Supreme Court assessed whether McGirt "commit[ted] his crimes in Indian country?" 591 U.S. at 898. No one disputed the geographic coordinates of McGirt's crimes. But the Court analyzed treaties and statutes to decide, as a matter of law, that the location of his crimes was in "Indian country." *Id.* at 903–38.

the *court* assessed that location's jurisdictional status as a matter of law. *Id.* at 164, 168–69.

This approach is nothing new in our circuit. Decades ago, we treated a location's jurisdictional status as a legal question. *See United States v. Lovely*, 319 F.2d 673, 676–80 (4th Cir. 1963). On a 28 U.S.C. § 2255 motion, Lovely argued that jurisdiction of New Fort Jackson, ceded by South Carolina, never vested in the federal government. *Id.* at 675. To resolve this dispute, we analyzed documents submitted by the government—a condemnation judgment and a letter from the Secretary of War to the South Carolina governor—along with relevant South Carolina statutes. *Id.* at 676–80. And we concluded that not only had the federal government acquired the land and South Carolina ceded jurisdiction; the federal government had also accepted it. *Id*. at 680. That meant New Fort Jackson fell within federal territorial jurisdiction. *Id*. We then turned to the jury instructions on "the critical *factual* issue of whether the locus of the crime was within the boundaries of the New Fort Jackson area . . . ." *Id.* (emphasis added). The trial judge instructed the jury that "if a crime was committed at all, it occurred on the lands of Fort Jackson . . . ." *Id.* at 682. Although the court erred in taking the fact-conduct question away from the jury, we found no prejudice to Lovely because there was not "even the vaguest question" about his crime's location. *Id.*

In subsequent cases, we have treated the legal-status component as a question of law. In *United Sates v. Lossiah*, 537 F.2d 1250, 1251 (4th Cir. 1976), we noted a witness testified to the location of a murder and "[t]he Court properly took judicial notice that that town is within the Cherokee Indian Reservation." And in *United States v. Raffield*, 82 F.3d

12

611, 612–13 (4th Cir. 1996), we affirmed a conviction after concluding state and federal statutes established concurrent jurisdiction over Pisgah National Forest.[6]

Nor is this bifurcated approach unique to the Fourth Circuit. In *Davis*, the Second Circuit addressed a challenge to a federal prison's jurisdictional status under § 7(3). 726 F.3d at 368. The court described the underlying components of a federal territorial jurisdictional element:

> [T]o determine whether a crime took place within the special maritime and territorial jurisdiction of the United States requires two separate inquiries: one to determine the "locus of the crime" and one to determine the existence *vel non* of federal jurisdiction. *See* [*United States v. Hernandez-Fundora*, 58 F.3d 802, 810 (2d Cir. 1995)]. While the former is plainly a factual question for the jury to decide, the latter—turning on a fixed legal status that does not change from cases to case and involving consideration of source materials (such as deeds, statutes, and treaties) that judges are better suited to evaluate than juries—has always been treated in this Circuit as a legal question that a court may decide on its own.

*Id.* The Sixth, Eighth and Ninth Circuits have similarly divided territorial jurisdiction into fact-conduct and legal-status components. *See, e.g.*, *United States v. Silvers*, 129 F.4th 332, 342 (6th Cir. 2025) (explaining that jurisdictional elements require a legal inquiry into "the pure question of a location's jurisdictional character" and a factual inquiry into "whether the alleged offense occurred within that area"); *United States v. Love*, 20 F.4th 407, 411 (8th Cir. 2021) (analogizing territorial jurisdictional status to the Major Crimes Act's "within the Indian country" status, and concluding that "federal jurisdiction over a

---

[6] In recent unpublished decisions, we have continued to treat a crime's location as an issue for a factfinder and the location's jurisdictional status as an issue for the court. *See, e.g.*, *United States v. Bridges*, No. 94-5130, 1994 WL 687301, at *1 (4th Cir. Dec. 9, 1994); *United States v. Johnson*, 738 F. App'x 798, 799 (4th Cir. 2018).

13

particular place is a question of law"); *United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993) (a court "may determine as a matter of law the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is an issue for the trier of fact" (quoting *United States v. Gipe*, 672 F.2d 777, 779 (9th Cir. 1982))).

Perez responds to this precedent with *United States v. Jackalow*, a piracy case involving a venue challenge.[7] 66 U.S. 484, 484–85 (1861). Jackalow boarded a ship off the coast of New York and "piratically" assaulted its master. *Id.* at 485. The government prosecuted him in the Circuit Court of the United States for the District of New Jersey.[8] *Id.* Under the Constitution's Venue Clause, however, criminal venue only lies "in the State where the said crimes shall have been committed," unless the crime was committed outside

---

[7] While pirates still wreak havoc at times on the high seas, the golden age of piracy was during the seventeenth and early eighteenth centuries. *See* Gabriel Kuhn, *Life Under the Jolly Roger: Reflections on Golden Age Piracy* 1 (2d ed. 2020). During that time, valuable cargoes moving across the oceans lured criminal activity. In fact, the final battle of Blackbeard, perhaps the most famous pirate, took place in 1718 off the North Carolina coast. *Id.* at 20–21. While interest in pirates has fueled modern adventure stories (Pirates of the Caribbean) and sports mascots (the Pittsburgh Pirates), it is odd to have two piracy decisions—issued centuries apart—relevant to the question we confront today. *See Jackalow*, 66 U.S. at 485; *Beyle*, 782 F.3d at 161.

[8] Prior to the creation of the modern federal circuit courts of appeal in 1891, Judiciary Act of 1891 (Evarts Act), ch. 517, § 2, 26 Stat. 826, 826–27, the "circuit courts" consisted of Supreme Court justices and district judges, *see* Judiciary Act of 1789, ch. 20, § 4, 1 Stat. 73, 74–75. These circuit courts would "ride" the circuit and meet separately in each district. *Id.* § 4. And they had original jurisdiction over many federal criminal actions. *Id.* § 11. In 1869, Congress created separate circuit court judgeships. Judiciary Act of 1869, ch. 22, § 2, 16 Stat. 44, 44–45. This decreased the need for circuit riding and enabled the circuit courts to sit concurrently in different districts. *Id.* From 1891 until 1912, the circuit courts coexisted alongside the modern federal circuit courts of appeal. Congress abolished the circuit courts in 1912. *See* Judicial Code of 1911, ch. 231, § 289, 36 Stat. 1087, 1167 (1912).

any state. U.S. Const., art. III, § 2. So, the case presented the issue of whether Jackalow committed his offense "out of the jurisdiction of any particular State." *Jackalow*, 66 U.S. at 486. If he committed the offense in New York or Connecticut, venue only laid in those forums. *See id.* If, however, he committed the offense outside of any state, venue in New Jersey was permissible. *See id.*

By special verdict, the jury found that the precise location of the ship at the time of the crime was "in the waters adjoining the State of Connecticut, between Norwalk harbor and Westchester county, in the State of New York, at a point five miles eastward of Lyons's Point, . . . and one mile and a half from the Connecticut shore at low-water mark." *Id.* at 485. But to the Supreme Court, that was not enough. The Court held that in a venue dispute, a jury must determine not just the location of the crime but the state boundary lines. It explained that "[a]ll the testimony bearing upon this question, whether of maps, surveys, practical location, and the like, should be submitted to them under proper instructions to find the fact." *Id.* at 487–88. Only after the jury finds the boundary lines can "the court [] determine whether or not the offence was committed out of the jurisdiction of a State . . . ." *Id.* at 488.

Perez believes *Jackalow* "cut[s] the Gordian knot" in his case. Perez Reply Br. at 6. And at face value, one might argue that *Jackalow*'s venue reasoning should be extended to the jurisdictional inquiry we face. After all, determining state boundary lines is arguably similar to determining whether a prison is within the United States' special territorial jurisdiction. But Perez's case does not raise the venue issue present in *Jackalow*. *See Silvers*, 129 F.4th at 359 (Thapar, J., concurring in judgment) (declining to apply *Jackalow*

15

to a territorial jurisdictional element dispute because *Jackalow* only addressed venue). And over the last 160 years, the Supreme Court has never cited *Jackalow* for the proposition that a jury decides a location's jurisdictional status. In fact, the Supreme Court has barely cited *Jackalow* at all. On our count, the Court has cited the case only three times, two of which were in the 1890s and never discussed the roles of courts and juries. *See Cook v. United States*, 138 U.S. 157, 183 (1891); *United States v. Rodgers*, 150 U.S. 249, 283 (1893) (Brown, J., dissenting). The Court recently cited *Jackalow* again, but without reference to its allocation of jury and court responsibilities. *See Smith v. United States*, 599 U.S. 236, 250 (2023). We have found no Fourth Circuit references to *Jackalow*.

What's more, Supreme Court decisions after *Jackalow* contradict Perez's reading of that Civil War-era decision. In *Jones v. United States*, 137 U.S. 202, 216 (1890), the Court affirmed taking judicial notice of a Caribbean island's status within federal territorial jurisdiction. In reaching that conclusion, the court held that "[a]ll courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer, or of its recognition or denial of the sovereignty of a foreign power, as appearing from the public acts of the legislature and executive, although those acts are not formally put in evidence, . . . ." *Id.* at 214. The Court then resolved jurisdictional status itself via judicial notice. *Id.* at 217; *see also Silvers*, 129 F.4th at 355–56 (Thapar, J., concurring in judgment). And in *Adams*, the Court considered whether the federal government accepted jurisdiction over Camp Claiborne in compliance with 40 U.S.C. § 3112 (formerly codified at 40 U.S.C. § 255). 319 U.S. at 312–13. The Court decided the government had not, reasoning that "[s]ince the government had not

16

accepted jurisdiction in the manner required by the Act," Camp Caliborne was outside of federal territorial jurisdiction. *Id.* at 315. As a result, Adams' conviction could not stand. *Id.* But most important for our purposes, a court—not a jury—assessed the camp's jurisdictional status.

Also, as demonstrated above, we have long assessed a location's jurisdictional status—in a criminal case—as a question of law without regard for *Jackalow*. *See, e.g.*, *Beyle*, 782 F.3d at 166–69; *Lovely*, 319 F.2d at 676–80. The same is true for many of our sister circuits. *See, e.g.*, *Davis*, 726 F.3d at 368; *Silvers*, 129 F.4th at 348; *Love*, 20 F.4th at 411; *Warren*, 984 F.2d at 327. Adding another persuasive piece to the puzzle, Judge Thapar's *Silvers* concurrence points out that state courts have long treated a location's jurisdictional status—in a criminal case—as a legal question. *See Silvers*, 129 F.4th at 357–59 (Thapar, J., concurring). We, therefore, hold that *Jackalow*'s allocation of responsibilities between jury and court in a venue dispute does not control how juries and courts must assess a location's federal jurisdictional status.

To sum up this question-of-law versus question-of-fact issue, criminal jurisdictional elements often contain an embedded legal-status component—does activity "xyz" affect interstate commerce, or is location "123" within federal territorial jurisdiction? *See, e.g.*, *Taylor*, 579 U.S. at 308; *Lovely*, 319 F.2d at 676–80. The jury must find the fact-conduct component—that defendant undertook activity "xyz" or committed the crime at location "123." But a court must determine the legal-status component as a matter of law. Although *Jackalow* dictates that a jury find material facts for purposes of venue, no precedent has applied it to a federal territorial jurisdictional element. We decline to do so here.

17

Judge Harris agrees that criminal jurisdictional elements have fact and legal components. *See* Diss. Op. at 43. But she interprets the legal component more narrowly than we do. According to her, the legal question is simply about the "*meaning* of a jurisdictional element." *Id.* at 11. So, she believes that in *Beyle*, the Fourth Circuit only decided the meaning of "high seas" as a matter of law. *Id.* at 11–12. And in *Taylor*, she believes the Supreme Court only interpreted what kind of impact sufficiently affects interstate commerce. *Id.* at 7.

With respect, we disagree. In *Beyle*, we determined the boundary between Somali waters and the "high seas," just as Judge Harris suggests. But we went further. We also concluded that the yacht, the pirates "and the victims were on the high seas when the murders occurred." 782 F.3d at 169. In other words, we determined—as a matter of law—that the crime itself occurred on the "high seas." We did not remand for the factfinder to apply our definition of "high seas" to the facts in the record.

Similarly, in *Taylor*, the Supreme Court did interpret the meaning of the interstate commerce element of the offense. But it did more than that. It also determined that robbery of a marijuana dealer's drugs or illegal proceeds affects interstate commerce as "a question of law." 579 U.S. at 308. In other words, the Court considered the "meaning" of interstate commerce by assessing the facts at hand. Following those two examples, a court can determine as a legal matter whether FCI Petersburg falls within the meaning of the "special maritime and territorial jurisdiction of the United States." § 7(3).

18

Thus, considered in its totality, precedent leans heavily one way. Post-*Apprendi* decisions from the Supreme Court, our Court and our sister circuits treat jurisdictional status as a legal question.

## 2. *Legislative versus Adjudicative Fact*

Even though a location's jurisdictional status is a question of law for a court, facts underlie that determination. To explain, recall that land falls within the special territorial jurisdiction of the United States when (1) the federal government acquires the land; (2) the state consents to federal, or cedes its own, jurisdiction; and (3) the federal government accepts jurisdiction. 18 U.S.C. § 7(3); 40 U.S.C. § 3112; *Davis*, 726 F.3d at 363–64. Resolving these questions requires consideration of facts. And at first blush, one might naturally think all facts should be decided by the factfinder. After all, "[q]uestions of law are to be determined by the court; questions of fact, by the jury." *Nudd v. Burrows*, 91 U.S. 426, 439 (1875). But recognizing that facts are involved does not necessarily mean that the factfinder must decide them. That's because there are two kinds of facts—adjudicative and legislative. Treatises, courts and the Federal Rules of Evidence recognize this distinction. *See, e.g.*, Kenneth C. Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 402 (1942); *Davis*, 726 F.3d at 366; Fed. R. Evid. 201(a) advisory committee's note to 1972 proposed rules.

Adjudicative facts concern "the immediate parties—who did what, where, when, how, and with what motive or intent." Fed. R. Evid. 201(a) advisory committee's note to 1972 proposed rules. Such facts "normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses." *Id.* Under Rule 201, courts may

notice adjudicative facts only in particular circumstances and must instruct a criminal jury "that it may or may not accept the noticed fact as conclusive." Fed. R. Evid. 201(f). An adjudicative fact is therefore the kind of factual issue ordinarily decided by a jury. *See* 2 *McCormick on Evidence* § 328 (8th ed. 2022).

Other facts, dubbed "legislative facts," involve "established truths, facts or pronouncements that do not change from case to case but apply universally . . . ." *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976). Such facts "have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." Fed. R. Evid. 201(a) advisory committee's note to 1972 proposed rules. Courts judicially notice them when assessing the constitutional validity of, or interpreting, a statute. *See* 2 *McCormick on Evidence* § 328 (8th ed. 2022). "No rule [of evidence] deals with judicial notice of 'legislative' facts," so a court may notice a legislative fact and charge a criminal jury with accepting its truth. Fed. R. Evid. 201(a) advisory committee's note to 1972 proposed rules. Or a court of appeals can judicially notice a legislative fact in the first instance, even in criminal cases. *See, e.g.*, *Davis*, 726 F.3d at 367 (citing *United States v. Lavender*, 602 F.2d 639, 641 (4th Cir. 1979)).

With these categories in mind, what type of facts—adjudicative or legislative— underly a § 7(3) analysis? First off, assessing a property's status under § 7(3) involves some purely legal considerations. Whether a state has consented to federal jurisdiction, or ceded its own, requires an assessment of state statutes. *See, e.g.*, *Lovely*, 319 F.2d at 676– 80 (analyzing South Carolina statutes); *Raffield*, 82 F.3d at 612–13 (analyzing North

Carolina statutes); *Davis*, 726 F.3d at 368–70 (analyzing New York statutes); *Palmer v. Barrett*, 162 U.S. 399, 403 (1896) (analyzing New York statute). Whether the federal government has accepted jurisdiction often turns on whether 40 U.S.C. § 3112 applies. *See, e.g.*, *Markham*, 215 F.2d at 58; *Davis*, 726 F.3d at 369. The court has a duty "to expound the law" on these matters. *Sparf v. United States*, 156 U.S. 51, 106 (1895). And Perez concedes that "[t]he text of a statute is unquestionably a legislative fact." Perez Reply Br. at 12 n.4. So there is no dispute the court must consider federal and state statutes as it addresses jurisdictional status under § 7(3).

Section 7(3) also requires consideration of particular facts. *Did* the federal government acquire the property, and *when* did acquisition occur? We agree with most of our sister circuits that these are legislative facts and thus disagree with our dissenting colleague's contrary view. Drawing on Professor Kenneth Davis' *Administrative Law Treatise*, the Eighth Circuit described legislative facts as unrelated "specifically to the activities or characteristics of the litigants. . . . Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case." *Gould*, 536 F.2d at 220. Accordingly, "facts that resolve the special maritime and territorial jurisdiction question are legislative, not adjudicative." *Love*, 20 F.4th at 411; *see also Silvers*, 129 F.4th at 343. The Second Circuit has also concluded "that resolution of the [territorial] jurisdictional issue in this case requires the determination of legislative facts, rather than 'adjudicative facts . . . .'" *Hernandez-Fundora*, 58 F.3d at 811. It cited an apt example from Professor Davis' treatise, explaining that "[w]hether 123 C Street is inside or outside the city is a

21

question about 123 C Street, not about a party. . . . [T]he fact that that address is *within the city* is not an adjudicative fact." *Id.* at 812 (quoting 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 10.6, at 155 (3d ed. 1994) (emphasis added)). And this circuit has even affirmed, in an unpublished opinion, a district court's noticing of legislative facts informing a veteran hospital's status within federal jurisdiction. *See Johnson*, 738 F. App'x at 799.

Perez and our dissenting colleague instead rely on the First Circuit's minority approach of classifying facts about territorial jurisdiction as adjudicative. In *United States v. Bello*, the defendant challenged whether the district court could take judicial notice of federal jurisdiction of a detention center. 194 F.3d 18, 20 (1st Cir. 1999). The court concluded that classification of a fact turns "not on the nature of the fact—e.g., who owns the land—but rather on the use made of [the fact] (*i.e.*, whether it is a fact germane to what happened in the case or a fact useful in formulating common law policy or interpreting a statute) . . . ." *Id.* at 22. Applying that standard, the court concluded that "[w]here the prison sits is an element of the offense and unquestionably an adjudicative fact . . . ." *Id.* at 23.

We disagree with the First Circuit's approach for several reasons. First, it is an outlier. In fact, the First Circuit acknowledged its departure from the approach of other circuits and Professor Davis' treatise. *Id.* at 23 n.4; *see also* 21B Charles Alan Wright, Arthur R. Miller & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5103.2 & nn.17–18 (2d ed. 2024) (concurring with *Bello* and rejecting the "intrinsic" approach to legislative facts in *Davis* and other cases). Second, although the government is a party to this case, Perez's actions at FCI Petersburg are almost entirely divorced from the federal

22

government's acquisition of the property by deed and condemnation in 1919. When the federal government acquired the property is not "germane to what happened" in Perez's case.[9] *Bello*, 194 F.3d at 22. Second, FCI Petersburg's jurisdictional status is unchanging. It applies to any case relying on the federal government's jurisdiction of the prison. Tasking a jury with the "nuanced and cumbersome" § 7(3) analysis "would leave open the distinct possibility of conflicting decisions as to federal jurisdiction over an identical parcel of property—a status which by its nature either exists or doesn't exist." *United States v. Johnson*, No. 3:17-CR-136, 2018 WL 1023355, at \*2 (E.D. Va. Feb. 22, 2018). Third, our precedent has treated these facts as legislative in nature. In *Lavender*, we explicitly noticed—on appeal following a jury verdict—the Blue Ridge Parkway's federal jurisdictional status. 602 F.2d at 641. If the underlying jurisdictional facts are adjudicative, then *Lavender* violated Federal Rule of Evidence 201(f)—and potentially the defendants' Sixth Amendment rights—by noticing the facts without instructing the jury that it could accept or deny them. We instead read *Lavender* to illuminate the legislative nature of jurisdictional facts.[10] As we explained many decades ago, "the United States is not called

---

[9] Judge Harris argues the factual portion of the jurisdictional element here should be treated like the interstate commerce requirement of felon-in-possession prosecutions under 18 U.S.C. § 922(g)(1). *See* Diss. Op. at 52. But that situation seems quite distinct from this case. Whether a particular firearm in defendant's possession has travelled in interstate commerce is "germane to what happened" in the defendant's case. Whether the government acquired the real property on which FCI Petersburg sits in 1919 versus 1940 is not.

[10] Judge Harris recognizes the problem of reading *Lavender* as taking notice of adjudicative facts on appeal in a criminal case. *See* Diss. Op. at 59. If *Lavender*'s reference

on to try title in a murder case." *Schoppel v. United States*, 270 F.2d 413, 418 (4th Cir. 1959) (citing *Holt v. United States*, 218 U.S. 245, 252 (1910)).

In addition to *Bello*, Perez argues that our *United States v. Burroughs* decision supports his argument that FCI Petersburg's jurisdictional status is a question of adjudicative fact. 564 F.2d 1111 (4th Cir. 1977) (*Burroughs II*), *abrogated on other grounds by United States v. Steed*, 674 F.2d 284, 285 n.2 (4th Cir. 1982) (en banc). There, a jury convicted Burroughs and another defendant of intercepting oral communications under 18 U.S.C. § 2511(1)(a) when they listened in on union-related conversations via a motel's internal telephone system. *Id.* at 1112–13; *see also United States v. Burroughs*, 379 F. Supp. 736, 738–39 (D.S.C. 1974) (*Burroughs I*). Even though § 2511(1)(a) contains no federal jurisdictional element, the district court read in such an element to preserve the statute's constitutionality. *Burroughs I*, 379 F. Supp. at 740–41. "All that would have to be shown to establish an effect on interstate commerce is that the telephone which was transformed into a listening device was used in interstate commerce." *Id.* at 744. But at defendants' jury trial, the government failed to prove that the telephone service provider whose system the defendant used to eavesdrop was a communications common carrier in interstate commerce. *Id.* And the government failed to ask the trial court to take judicial notice of that information during trial. *Id.* It asked the court to do so on defendants' motion

---

to "commonly known facts" classified jurisdictional status as an adjudicative fact, then *Lavender* violated the Federal Rules of Evidence and potentially the Sixth Amendment. We decline to read such a major error into our precedent. And to be clear, the appellants in *Lavender* explicitly argued that the government failed to prove the Blue Ridge Parkway's jurisdictional status—the same issue we face today.

for judgment of acquittal, but the court held that because "[t]his was not done in the instant case [before the jury] . . . it [was] now too late." *Id.*

We agreed that "some basis for federal jurisdiction [must] be established at trial." *Burroughs II*, 564 F.2d at 1115. The government neither presented evidence of such a federal nexus at trial nor requested "during trial that the trial court take judicial notice of facts from which some federal nexus might have been found as fact." *Id.* The government asked us to take judicial notice on appeal, but in a footnote we "refuse[d] to take judicial notice of the fact that defendants' electronic eavesdropping had an effect on interstate commerce." *Id.* at 1115 n.7. Noting that "[t]he district court declined to take judicial notice of the existence of a federal nexus," we refused to take "judicial notice on appeal of an unproven essential element of a criminal offense." *Id.*

*Burroughs II* does not provide a lot of explanation for why it did not take judicial notice on appeal. But viewed alongside the district court's decision, *Burroughs II* might be read to imply that the telephone service provider's status as a communications common carrier in interstate commerce was an adjudicative fact. *See Burroughs I*, 379 F. Supp. at 744. Standing alone, this implied reasoning might support Perez's argument.[11] But even were we to credit that implicit reasoning, we cannot view the *Burroughs* decisions in isolation. We must view them along with prior and subsequent decisions from the Supreme Court and our Court.

---

[11] This is not the only plausible reading of the *Burroughs* decisions. They might also be read to reflect a concern with the timing of the government's request for judicial notice in a jury case. *Cf.*, *infra*, n.16.

25

Those decisions compel a different approach. First, the Supreme Court's later reasoning in *Taylor* directly contradicts Perez's interpretation of the *Burroughs* decisions. In Perez's view, the *Burroughs* decisions indicate the jury should decide whether the telephone service provider "is a communications common carrier[.]" *Burroughs I*, 379 F. Supp. at 744. But remember *Taylor* held that the government must prove "the defendant engaged in conduct that satisfies the Act's commerce element, but the meaning of that element is a question of law." *Taylor*, 579 U.S. at 308. And the *Taylor* Court determined as a matter of law that marijuana robbery affects interstate commerce. So, under *Taylor*, the government in *Burroughs* would have had to prove the defendants used a telephone. But whether that telephone's service provider qualifies as a communications common carrier in interstate commerce—and whether location "123" falls within federal territorial jurisdiction—are legal-status questions that a court must resolve. That resolution demands consideration of legislative facts. *See Silvers*, 129 F.4th at 343. To the extent the *Burroughs* decisions might be read to require that a jury make this determination, that reasoning would be "inconsistent with Supreme Court authority . . . ." *United States v. Banks*, 29 F.4th 168, 178 (4th Cir. 2022). And when a prior decision of this Court rests on reasoning inconsistent with a Supreme Court decision, it becomes "untenable" authority that we decline to follow. *Id.* at 175.

Second, even if *Taylor* did not render the *Burroughs* decisions untenable, Perez's reading would be inconsistent with prior Fourth Circuit precedent. Several earlier decisions of this Court affirm the propriety of judicially noticing facts informing the legal-status component. In *Markham*, while trial evidence showed the defendant committed his crime

26

at a military base, we explained "the court could take judicial notice of [the base's] acquisition and of the exercise of jurisdiction over it by the Government of the United States." 215 F.2d at 57. In *Lossiah*, testimony established that a murder occurred at "the Boundary Tree Motel in the Town of Cherokee, North Carolina," and "[t]he Court properly took judicial notice that that town is within the Cherokee Indian Reservation." 537 F.2d at 1251. Unlike Perez's view of the *Burroughs* decisions, these cases speak directly to the legislative nature of facts informing a location's jurisdictional status. His view is irreconcilable with prior binding law. *See McMellon v. United States*, 387 F.3d 329, 332–33 (4th Cir. 2004) (explaining that an earlier-issued panel opinion controls over a later conflicting opinion). It is, therefore, little surprise that our subsequent decisions have not applied Perez's interpretation of the *Burroughs* decisions, either. *See, e.g.*, *Lavender*, 602 F.2d at 641; *Johnson*, 738 F. App'x at 799.

To conclude, a federal territorial jurisdictional element contains a fact-conduct question—where did the defendant commit the crime?—and a legal-status question—is that location within federal territorial jurisdiction? The fact-conduct question turns on adjudicative facts and is decided by the factfinder. Here, no one disputes the fact-conduct question—Perez committed these acts at FCI Petersburg. The legal-status question involves legislative facts—which may be judicially noticed—and questions of law for the court to find and decide. In this case, the legal-status question—whether FCI Petersburg is within federal territorial jurisdiction—turns on an analysis of 18 U.S.C. § 7(3).

27

**B.    The District Court's Analysis**

With these principles established, we turn to the district court's analysis of FCI Petersburg's jurisdictional status. The court took judicial notice that the prison was part of the special territorial jurisdiction of the United States. In doing so, it determined that the federal government has "practical usage and dominion" over FCI Petersburg. J.A. 205 (quoting *Erdos*, 474 F.2d at 159). But that conclusion mistakenly bypasses § 7(3)'s three-part test for special territorial jurisdiction: (1) federal acquisition of the property; (2) state consent to federal, or cession of its own, jurisdiction; and (3) federal acceptance of jurisdiction. *See* 18 U.S.C. § 7(3); *see also Davis*, 726 F.3d at 363–64. The district court failed to evaluate each element. To explain, we review our *Erdos* decision.

In *Erdos*, we considered whether an American embassy in the Republic of Equatorial Guinea fell within the special maritime and territorial jurisdiction of the United States, as defined in § 7(3). 474 F.2d at 159.[12] In accordance with the statutory elements, we determined that the federal government acquired the embassy by a lease and that it fell under the United States' concurrent jurisdiction. *Id.* at 159–60. But we also added the following explanation: "The test, as to property within or without the United States, [is] one of practical usage and dominion exercised over the embassy or other federal establishment by the United States government." *Id.* at 159.

---

[12] While we and the Ninth Circuit have found that 8 U.S.C. § 7(3) applies extraterritorially, the Second Circuit has rejected its extraterritorial application. *Compare Erdos*, 474 F.2d at 160, *and United States v. Corey*, 232 F.3d 1166, 1183 (9th Cir. 2000), *with United States v. Gatlin*, 216 F.3d 207, 210 (2d Cir. 2000). We do not address that issue today.

28

The district court applied that language as if it were the § 7(3) test. And the Sixth Circuit did the same in *Blunt*, concluding that a federal prison fell within federal jurisdiction because the federal government exercised "practical usage and dominion" over it. 558 F.2d at 1246–47. But the federal government's practical usage and dominion alone does not address whether the property satisfies the § 7(3) elements. The Supreme Court's decision in *Adams* makes this clear. There, the federal government exercised practical usage and dominion over Camp Claiborne during World War II. *See Adams*, 319 U.S. at 312 (assessing jurisdictional status of a military camp for which the federal government held title). Yet the Supreme Court found no federal jurisdiction over Camp Claiborne because of a lack of federal acceptance. *Id.* at 313, 315. By relying on the *Erdos* gloss and overlooking the statutory elements of § 7(3) in this case, the district court erred.[13]

Other cases cited by the district court exemplify a proper § 7(3) analysis. In *United States v. Corey*, the Ninth Circuit determined (1) the United States acquired the Yokota Air Force Base; (2) Japan ceded concurrent jurisdiction via treaty; and (3) the United States accepted concurrent jurisdiction through the same treaty. 232 F.3d 1166, 1176–77, 1181–82 (9th Cir. 2000). In *Davis*, the Second Circuit determined (1) the federal government

---

[13] To the district court's credit, it did address the letters attached to the government's Rule 29 response brief. J.A. 206 n.5. It explained that the letters reflected the federal government's acquisition of the property some time before 1940 and therefore defeated Perez's invocation of 40 U.S.C. § 3112's presumption against acceptance. *Id.* at 206–07. So the district court addressed the third element of a § 7(3) analysis—acceptance of jurisdiction by the federal government. But its analysis remained incomplete; it never squarely addressed federal acquisition or state consent to, or cession of, jurisdiction. The government conceded as much at oral argument. *See* Oral Arg. at 21:26–21:34.

acquired the relevant property in 1918; (2) New York consented to federal jurisdiction for broad purposes, including prisons; and (3) the federal government's acceptance was presumed because the purchase occurred prior to 1940. 726 F.3d at 368–70.

Without consideration of each of § 7(3)'s elements, we do not know whether FCI Petersburg is within the special maritime and territorial jurisdiction of the United States. The parties diverge on what we should do on appeal. Because Perez believes jurisdictional status is a fact question for the jury, he insists double jeopardy prevents the government from proving FCI Petersburg's jurisdictional status on appeal or remand. But because jurisdictional status is a legal question based on legislative fact, resolving it on appeal or remand poses no double jeopardy concern; instead, there was simply "an error in the proceeding[] leading to conviction . . . ." *Burks v. United States*, 437 U.S. 1, 14 (1978) (quoting *United States v. Tateo*, 377 U.S. 463, 465 (1964)).

The government urges us to judicially notice several hundred pages of documents—state statutes, government publications, land transactions and a condemnation judgment—and affirm based on them. And it is correct that precedent permits us to notice these facts for the first time on appeal. *See Lavender*, 602 F.2d at 641; *see also Davis*, 726 F.3d at 367.[14]

We believe the better course here, however, is for the district court to assess the government's many documents on remand. When "an appellate court discerns that a district

---

[14] To be sure, appellate courts engage in legislative fact finding all the time. *See, e.g.*, *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 489–95, 489 n.4, 494 n.11 (1954); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38–70 (2022).

court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be remand for further proceedings to permit the trial court to make the missing findings." *United States v. Bailey*, 74 F.4th 151, 160 (4th Cir. 2023) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982)). And remanding for further inquiry in a criminal case is a recognized remedy. *See, e.g.*, *Kolod v. United States*, 390 U.S. 136, 137 (1968) (remanding so district court could hold a hearing on the relevance of unlawful electronic eavesdropping to the convictions); *United States v. Hung*, 629 F.2d 908, 920 (4th Cir. 1980) (remanding so district court could screen whether documents contained Jencks Act material); *United States v. Stoddart*, 574 F.2d 1050, 1054–55 (10th Cir. 1978) (remanding so district court could hold a hearing and apply a proper speedy trial analysis).

What's more, we perform our best work as "a court of review, not of first view." *Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)). So, we vacate the current judgment of conviction and remand for the district court to assess FCI Petersburg's jurisdictional status. *See* 28 U.S.C. § 2106.[15] The district court can decide which, if any, legislative facts to judicially notice. Perez can challenge the noticed facts and raise arguments he made here—that the documents do not clarify the jurisdictional status of his cell's location and that the Department of Defense's transfer of the property to the Bureau of Prisons triggered a reversion clause in Virginia's general consent statute. The government can dispute those arguments. Then the district

---

[15] We, therefore, dismiss the government's pending motion for judicial notice as moot. The government can move the district court to notice these documents on remand.

31

court can apply § 7(3)'s three-element test to assess FCI Petersburg's jurisdictional status. If the district court concludes FCI Petersburg is within the special maritime and territorial jurisdiction of the United States, "it will enter [a] new final judgment[] of conviction[] based on the existing record as supplemented by its further findings[.]" *Kolod*, 390 U.S. at 138. If not, the district court must enter a judgment of acquittal.[16]

### III. Conclusion

Accordingly, we agree with the district court that FCI Petersburg's jurisdictional status is a legal question for the court that involves legislative facts. We vacate the district court's judgment of conviction because the court did not properly assess FCI Petersburg's jurisdictional status. And we remand for a proper analysis of jurisdictional status consistent with this opinion.

*VACATED AND REMANDED*

---

[16] It might matter that Perez's conviction followed a bench trial. In the case of a jury trial, it would seem odd, if not problematic, that a jury could find the fact-conduct component and convict the defendant *before* the court assessed the location's jurisdictional status. Said another way, if a jury first finds a defendant committed a crime at location "123" and convicts, before the court concludes location "123" is within federal territorial jurisdiction, it is not clear the jury *found* the jurisdictional element satisfied. To avoid any sequencing problem, the best practice for district courts is to first resolve the legal-status component and then charge the jury accordingly so that the jury has that law when it considers the evidence, including the evidence related to the fact-conduct component. *See Silvers*, 129 F.4th at 348. But a bench trial like Perez's does not pose these sequencing concerns. In a bench trial, the court is the factfinder, *see United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987), so it does not need to resolve the legal-status issue before the fact-conduct issue.

WYNN, Circuit Judge, concurring:

I agree that we should remand this case for the district court to reconsider the legal component of the jurisdictional element and write separately to emphasize that my concurrence hinges on the fact that this matter was tried as a bench trial, not before a jury.

As Judge Quattlebaum acknowledges, the resolution of this appeal would have been different had a jury, and not the district court, served as the finder of fact at trial. *See* Maj. Op. at 32 n.16. Jurisdictional elements "must be proved to a jury beyond a reasonable doubt." *Torres v. Lynch*, 578 U.S. 452, 467 (2016). The jurisdictional element of the statute at issue contains a mixed question of law and fact. The legal component is to determine whether a location falls within the special maritime and territorial jurisdiction of the United States; the factual component is to determine whether the offense occurred at that location. *See* 18 U.S.C. § 1466A(d)(5). In a jury trial, the judge determines the legal component of a jurisdictional issue and then the jury the factual component.

Had this trial proceeded before a jury, I doubt that we could remand this case without infringing upon Perez's Sixth Amendment right to trial by jury. After all, "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *United States v. Gaudin*, 515 U.S. 506, 514 (1995). In this way, the jury is not just making factual findings in a void but is applying law to those findings in order to render a verdict. For this application to be meaningful, the jury must understand the full import and consequences of its findings. The manner in which jury trials proceed demonstrates this understanding: when decision-making is bifurcated between finders of fact and a finder of law, the very

act of submitting factual questions to the fact finders seems to presuppose that the dispositions of those factual questions have already been deemed legally significant.

The Supreme Court has long recognized the right of a criminal defendant to select between trial by judge and jury and to have their trial completed by their chosen tribunal. *See, e.g.*, *Wade v. Hunter*, 336 U.S. 684, 689 (1949). Had Perez decided to proceed in front of a jury, it is not obvious how his choice of tribunal could be respected if we were to remand for the judge to reconsider the legal component of the jurisdictional question. After all, the jurors would have been discharged after they had rendered a verdict and almost certainly could not be reassembled. *But cf. Dietz v. Bouldin*, 579 U.S. 40, 51 (2016); *Summers v. United States*, 11 F.2d 583, 586 (4th Cir. 1926). The genie would have already escaped the bottle.

I believe that it is only permissible to remand the legal component of a jurisdictional element in a criminal statute when a defendant has elected to forgo trial by jury. In cases where, as here, the proceedings below had been conducted as a bench trial, on remand, the defendant's chosen tribunal will decide the legal component and had already decided the factual component. So, the defendant's choice of tribunal will be respected. And, because an Article III judge is making the determination on the legal component, any concern related to the sequencing of the questions and how it relates to the application of law to fact are ameliorated.

Additionally, I agree with Judge Harris's observation that this appeal presents a difficult question that appears to be recurring. *See United States v. Davis*, 726 F.3d 357,

34

371 (2d Cir. 2013); *United States v. Silvers*, 129 F.4th 332, 341–48 (6th Cir. 2025); *United States v. Love*, 20 F.4th 407, 412 (8th Cir. 2021).

The government can avoid uncertainty in future prosecutions by confirming that the process prescribed in 18 U.S.C. § 7(3) was followed for every federal prison. And, in the event that it was not, the government can, at least prospectively, resolve this problem by following the statute's strictures and creating a record of cessation of state jurisdiction and acceptance of federal jurisdiction.

PAMELA HARRIS, Circuit Judge, concurring in part and dissenting in part:

Nobody disputes that when the government went to trial in this case, it tried but failed to prove the facts necessary to establish an element of Mr. Perez's crime of conviction. It would seem, then, that a judgment of acquittal is in order. But the majority holds otherwise. The unproven facts relate to the jurisdictional status of the place where Perez committed his alleged crime, the majority reasons, and they are "legislative" facts that can be judicially noticed at any time – even on appeal, after a purported criminal conviction.

I disagree. The government used to disagree, too. At trial, it attempted to prove, beyond a reasonable doubt, all of the facts necessary to satisfy a jurisdictional element of the statute under which Perez was charged. Indeed, that was the whole point of the trial; Perez did not dispute the other elements of his offense, and contested only jurisdiction. With that issue front and center, the government advanced two different and alternative theories under which, it said, it could prove jurisdiction. The problem for the government is that its efforts at proof failed under both.

So now, to salvage its conviction, the government comes to us with a new theory that would excuse its trial failures and relieve it, retroactively, of the need to prove facts establishing all the elements of Perez's offense. In my view, we should not endorse that counterintuitive result. Because the government did not prove facts necessary to satisfy all

36

the elements of the criminal offense with which Perez was charged, Perez's conviction must be reversed.[1]

## I.

I begin by filling in some details of the government's ill-fated attempts to prove, at Perez's bench trial, the jurisdictional element of the charged offense. I have no quarrel with the majority's able summary. *See* Maj. Op. at 6–8. But I think a closer review of the trial record helps to set the stage, because it reflects that all parties to this case understood from the start that the government had the burden of proving facts necessary to satisfy the jurisdictional element of Perez's crime. The government, the public defender, and the district court – all repeat players, all with a thorough and practical understanding of how criminal trials work – all agreed that the government was required to "prove up" jurisdiction, the only element challenged at Perez's trial.[2]

---

[1] As explained below, I agree with the majority that the district court erred in its analysis of FCI Petersburg's jurisdictional status, overlooking the statutory standard set out in 18 U.S.C. § 7(3) and relying instead on *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973), *see* Maj. Op. at 28–30, and concur in that aspect of its opinion. I also support the majority's decision to remand for the district court to assess, in the first instance, the several hundred pages of new documents the government has produced on appeal. *See* Maj. Op. at 30–32.

[2] As the majority points out, the government at trial argued that "the status of a place as within the 'special maritime and territorial jurisdiction of the United States' is a question of law for the Court." Maj. Op. at 6 n.2 (quoting J.A. 19). But the government never suggested – at least not until after trial – that "the underlying facts needed to determine FCI Petersburg's [jurisdictional] status," *id.* at 8, did not need to be proven at trial and could instead be judicially noticed. Instead, the government tried and failed to prove such facts at trial. *See* J.A. 19, 58–60.

The government first attempted to establish federal jurisdiction by proving a nexus with foreign commerce. As the majority explains, Perez was charged with two counts of using a prison photocopier to produce and possess child pornography, in violation of 18 U.S.C. § 1466A. Maj. Op. at 5. To show these images were "produced using materials that have been . . . shipped or transported in interstate or foreign commerce" – thus satisfying the jurisdictional element of § 1466A(d)(4) – the government tried to prove that the prison photocopier had been designed in Japan and assembled in China.[3] As evidence, it relied on what seemed to be the photocopier's serial number, displayed on what it said was a photograph of the prison photocopier. But unfortunately for the government, that photograph turned out, as Perez showed at trial, to depict not the photocopier but instead its document feeder, a separate component with its own serial number. Because the government had no evidence that Perez used the document feeder or that the photocopier itself had travelled in interstate or foreign commerce, the district court concluded that the government could not prove jurisdiction under this theory.

That left the government with its alternative theory: that it could establish jurisdiction under § 1466A(d)(5) by proving Perez committed his offenses in the "special maritime and territorial jurisdiction of the United States." This effort, too, was a failure,

---

[3] The same fact, if proven, would have established jurisdiction under § 1466A(d)(1), which includes catchall language asserting federal jurisdiction when "any means or instrumentality of interstate or foreign commerce is otherwise used in committing or in furtherance of the commission of the offense." Because the government argued at closing that the photocopier was "used to produce the images," J.A. 105, I am assuming it intended to establish jurisdiction under § 1466A(d)(4). But nothing turns on this distinction.

38

for the reasons explained by the majority. The government sought to prove that FCI Petersburg was within the "special [] territorial jurisdiction" of the United States through testimony from prison guards describing the federal government's dominion and control over the facility. But as the majority rightly concludes – and the government now agrees – that standard, drawn from *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973), does not govern here. Instead, the government must establish special territorial jurisdiction by proving that the three requirements set out by 18 U.S.C. § 7(3) have been satisfied. Maj. Op. at 28. And nobody believes the government met that burden at trial.

In short, Perez was "convicted" under 18 U.S.C. § 1466A despite the fact that the government failed, twice over, to prove a jurisdictional element of the offense at his trial. This much is now common ground and undisputed. The only question is what follows from this failure of proof as to an element of the criminal offense with which Perez was charged.

## II.

The government's view is that its failed effort to prove jurisdiction at Perez's trial is without consequence. It turns out, the government says, that this has all been a big misunderstanding. It was *never* required to prove facts that would satisfy one of § 1466A(d)'s jurisdictional elements at Perez's trial and before Perez was convicted. Instead, it can simply ask us to take judicial notice of those facts on appeal. And to help, it has submitted more than 300 pages of documents with its appellate brief and an accompanying motion for judicial notice.

39

The majority mostly agrees.  It wisely declines the invitation to become an initial finder – or "noticer" – of fact, instead remanding to the district court for a first assessment of the government's documents.  But it adopts the government's position that a court may take judicial notice of the facts necessary to determine FCI Petersburg's jurisdictional status either at trial or post-conviction and on appeal.  And that is so, the majority reasons, because those jurisdiction-adjacent facts are "legislative" and not "adjudicative," so they may be judicially noticed outside the constraints of Federal Rule of Evidence 201.

This is a difficult question, which our court has not squarely addressed.  And while there are cases from the other courts of appeals pointing in different directions, I recognize that at least three circuits have adopted the approach of the government and the majority.  *See United States v. Silvers*, 129 F.4th 332, 342–43 (6th Cir. 2025); *United States v. Love*, 20 F.4th 407, 411–12 (8th Cir. 2021); *United States v. Davis*, 726 F.3d 357, 366–68 (2d Cir. 2013).  Still, I have a different view.

As I see it, the context in which this judicial-notice issue arises – a criminal prosecution – is dispositive.  Under the Constitution, any fact necessary to establish an element of a crime, jurisdictional or otherwise, must be proven by the government at trial beyond a reasonable doubt.  As for Rule 201, I would follow the First Circuit in holding that a fact relied on to establish an element of a crime is "adjudicative," which means that it is not subject to conclusive judicial notice under the terms of that Rule.  *See United States v. Bello*, 194 F.3d 18, 22–23 (1st Cir. 1999); Fed. R. Evid. 201(f) (making judicial notice non-conclusive in criminal cases).  That approach avoids the pitfalls of the majority's more

40

sweeping view of legislative facts and aligns Rule 201 with the Constitution's requirements for factfinding in criminal cases.

**A.**

1.

It is bedrock constitutional law that the government must prove every element of a crime beyond a reasonable doubt. *See United States v. Gaudin*, 515 U.S. 506, 510 (1995); *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (citing *Gaudin*). And the constitutional requirement that a factfinder (a jury, or, at a bench trial, a judge) must find a defendant guilty of every element of the crime extends to "the *facts* necessary to establish each of those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (emphasis added). In short, the Constitution – in this federal case, the Fifth and Sixth Amendments – "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

Until recently, courts sometimes treated jurisdictional elements, and especially those going to territorial jurisdiction, as a kind of exception to this rule. Our court, for instance, has allowed convictions to stand even if territorial jurisdiction had been established only by a preponderance of the evidence. *See United States v. Walker*, 878 F.2d 1431, at *1 (4th Cir. 1989) (per curiam) (citing *United States v. Bowers*, 660 F.2d 527, 531 (5th Cir. 1981)). But we can no longer rely on those precedents because that is no longer a viable approach. The Supreme Court has since clarified that jurisdictional and substantive elements have the same status for these purposes, and that jurisdictional

41

elements, as well as substantive elements, "must be proved to a jury beyond a reasonable doubt." *Torres v. Lynch*, 578 U.S. 452, 467 (2016).

I do not understand the government or the majority to dispute this general proposition. So we may take this constitutional command as our starting point.

2.

Nor is there any dispute that questions of law, unlike questions of fact, fall outside this principle, and are for a court rather than a jury to decide. And I agree with the majority that "criminal jurisdictional elements often contain an embedded legal component" or question, Maj. Op. at 10 – which I would describe, at least in most cases, as a question about the scope or "meaning of the element that must be proved." *See Taylor v. United States*, 579 U.S. 301, 308 (2016).

Also like the majority, I think *Taylor* provides an excellent example. There, the Supreme Court explained that the government must prove at trial all facts necessary to show a defendant's conduct satisfies the commerce element of the Hobbs Act. At the same time, the "*meaning* of that element" – the kind of impact on interstate commerce required – is a question of law, not a question of fact. *Id.* at 308 (emphasis added); *see also id.* at 306 (treating as a question of law "how far this commerce element extends" and "what the Government must prove to meet it"). In *Taylor*, the Court answered that legal question by holding that the jurisdictional element was satisfied – the effect on commerce was sufficient – if a defendant targeted a drug dealer, attempting to rob him of drugs or drug proceeds. *Id.* at 308. So that is what the prosecution was required to prove beyond a

42

reasonable doubt: not only that Taylor committed a robbery, and but also that he "targeted a marijuana dealer's drugs or illegal proceeds." *Id.*

Another good example would be the felon-in-possession statute, which prohibits a person convicted of a felony from possessing a firearm or ammunition "in or affecting commerce." 18 U.S.C. § 922(g)(1). We have treated the scope of that jurisdictional element – "in or affecting commerce" – as a question of law, holding that it extends to cover any weapon that has "previously traveled in interstate or foreign commerce." *United States v. Ervin*, 131 F.4th 253, 260 (4th Cir. 2025). But there is also a factual component, requiring the government to prove, beyond a reasonable doubt, conduct satisfying that element: not only that a person convicted of a felony possessed a firearm, but also that the firearm "had travelled in interstate or foreign commerce at some point during its existence." *Id.* at 259 (citation omitted); *see also, e.g.*, *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001) (explaining that government may prove jurisdictional element at trial by "showing that a firearm was manufactured outside the state where the defendant possessed it").

The same is true here. I agree with the majority that 18 U.S.C. § 1466A(d)'s "special territorial jurisdiction" element has both factual and legal components. There is no dispute, for instance, that as a factual component of its case under § 1466A(d), the government must prove beyond a reasonable doubt the location of Perez's offense – specifically, that it was committed at FCI Petersburg. Nor do I dispute that the scope of the "special territorial jurisdiction" element – "what the Government must prove to meet

43

it," *see Taylor*, 579 U.S. at 306 – is a question of law, like the scope of the commerce element under the Hobbs Act or § 922(g)(1).

But we have now decided, as a matter of law, that the scope of that element is defined by 18 U.S.C. § 7(3): Land falls within the "special territorial jurisdiction" of the United States for purposes of § 1466A(d) when (roughly speaking) it is acquired by the federal government; the state consents to federal jurisdiction or cedes its own; and the federal government accepts jurisdiction. Some of those factors may themselves call for a purely legal analysis, as the majority explains, Maj. Op. at 20–21 – an evaluation of state statutes purportedly ceding jurisdiction, for instance, or of whether acts taken by the federal government to accept jurisdiction were done "in [a] manner prescribed by the laws of the State where the land is situated," 40 U.S.C. § 3112(b). But, critically, others will call for findings of fact, as the majority also recognizes – whether the government acquired the property on which FCI Petersburg sits, and if so, when that acquisition occurred, because the timing may be critical to whether jurisdiction has been accepted. *See* Maj. Op. at 21. What the government did and when it did it – those are fact questions, not questions of law.

And that, finally, is where I part ways with the majority – on the narrow but critical question of how those facts are to be found. In my view, showing that the government acquired FCI Petersburg's land before 1940 in order to satisfy 18 U.S.C. § 1466A(d)'s jurisdictional element is no different than showing that a defendant robbed a drug dealer to satisfy the Hobbs Act's jurisdictional element, or that a gun traveled across state lines to satisfy § 922(g)(1)'s. Each is a fact necessary to establish an element of the offense with which the defendant has been charged, so each must be proven beyond a reasonable doubt

44

by the prosecution at trial. *See Gaudin*, 515 U.S. at 510; *Sullivan*, 508 U.S. at 278. The government, in other words, was right the first time.

3.

The majority sees it differently – and again, I acknowledge, with support from some other circuits. On this understanding, the question of law in these cases is not just the scope of the special territorial jurisdiction element and "what the Government must prove to meet it." *See Taylor*, 579 U.S. at 306. It is also a question of law whether the government *has* met the element – whether FCI Petersburg in fact falls within the scope of the United States' special territorial jurisdiction under the 18 U.S.C. § 7(3) factors, because, *inter alia*, the United States *did* acquire the land on which the prison sits, and *did* acquire it before 1940. *See* Maj. Op. at 20–21 (concluding that whether a location falls within federal territorial jurisdiction is a question of law); *see also, e.g.*, *Davis*, 726 F.3d at 365–66 (same).

With respect, I do not understand how what gives every appearance of being a question of fact – say, when did the United States acquire the land under FCI Petersburg? – becomes a question of law. *See Dupree v. Younger*, 598 U.S. 729, 737 (2023) (purely legal question depends on "law books, not trial exhibits"). The answer cannot be in cases like *Taylor*, 579 U.S. 301, which, as described above, draw the line between law and fact differently. Nor should it rest on an intuition that the jurisdictional status of a federal prison will be so obvious that it cannot give rise to any meaningfully *disputed* questions of fact. *See Dupree*, 598 U.S. at 737 ("[A] purely legal question is, by definition, one whose answer is independent of disputed facts[.]"). Determining special territorial jurisdiction under 18 U.S.C. § 7(3) is not a simple matter of looking at a map, and "[o]ne cannot simply assume

45

that a federal installation on federal land automatically comes within [f]ederal jurisdiction." *Davis*, 726 F.3d at 366–67 (internal quotation marks and citation omitted) (discussing case in which federal prison was found to fall outside the special territorial jurisdiction of the United States).

The majority suggests that its result is compelled by precedent, but I disagree. It is true that in *Jones v. United States*, the Supreme Court held that "courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose law they administer . . . as appearing from the public acts of the legislature and executive, although those acts are not formally put in evidence." 137 U.S. 202, 214 (1890). But I would not put too much weight on *Jones*. The "public acts of the legislature and executive" referenced by the *Jones* Court sound very much like *law* – and judicial notice of law, as opposed to facts, is a commonplace and uncontroversial feature of judicial decision-making. *See Lamar v. Micou*, 114 U.S. 218, 223 (1885); Fed. R. Evid. 201 advisory committee's note to 1972 proposed rules ("Advisory Committee Note") (distinguishing between judicial notice of law and fact).[4] Perhaps for that reason, *Jones* affirmed a defendant's conviction only after recounting the factual evidence presented by

---

[4] The same is true of *McGirt v. Oklahoma*, 591 U.S. 894 (2020), on which the majority also relies. There, the Court was required to assess whether the defendant "commit[ted] his crimes in Indian Country." *Id.* at 898. Because it was "obvious" and undisputed that Congress had established a reservation for the Creek Nation, *id.* at 899, the case turned on whether that reservation had been disestablished. And there "is only one place" courts may look "[t]o determine whether a tribe continues to hold a reservation," the Court explained: "the Acts of Congress." *Id.* at 903. Taking "notice" of and interpreting statutes and treaties is well within a court's prerogative, and does not raise the same issues as judicial notice of elemental *facts*.

46

the government at trial to prove jurisdiction. 137 U.S. at 204–08; *see also United States v. Lovely*, 319 F.2d 673, 676 (4th Cir. 1963) ("At trial the Government introduced in evidence, as proof of asserted federal jurisdiction over the area in question, [public records] and an authenticated copy of a letter[.]").[5]

The majority also relies on our decision in *United States v. Beyle*, 782 F.3d 159 (4th Cir. 2015). But to my eye, that case stands only for the well-established *Taylor* proposition that the *meaning* of a jurisdictional element is a question of law for the court. There, the question was whether a yacht's location was on the "high seas" as that phrase is used in 18 U.S.C. § 7(1) to define the special maritime jurisdiction of the United States. *Id.* at 165–66. Our court answered that question as a matter of law – just as we have now decided, as a matter of law, that the meaning of the "special territorial jurisdiction" element under 18 U.S.C. § 1466A(d) is keyed not to *Erdos*, 474 F.2d at 157, as the district court believed, but to the factors in 18 U.S.C. § 7(3). Maj. Op. at 28–30. In *Beyle*, our determination of the "true legal meaning" of the phrase "high seas" – areas farther than twelve nautical miles off shore – was enough to resolve the case, because the defendant was contesting only the legal standard; it was "undisputed" at trial that the yacht was thirty to forty miles off shore. 782 F.3d at 164, 68–69 (internal quotation marks and citation omitted). But here, the

---

[5] That is also why Perez does not dispute (and nor do I) that a court could take judicial notice of the parts of the government's documentary submission consisting of various state statutes or other statements of law. But here, the government has also asked us to rely on non-public documents like letters, internal government memoranda, deeds, and the work of private land surveyors – none of which has been authenticated, and none of which appear to fall within the scope of *Jones* as "public acts of the legislature and executive," 137 U.S. at 214.

47

defense is the reverse:  Perez challenges not our decision to adopt the 18 U.S.C. § 7(3) factors to define "special territorial jurisdiction," but whether the *facts* establish that FCI Petersburg is within that jurisdiction so defined.

Then there is the question of the Supreme Court's decision in *United States v. Jackalow*, 66 U.S. 484 (1861).  In that case, the Court held that all the facts necessary to establish whether a criminal defendant committed his offense "out of the jurisdiction of any particular State" – including the location of state boundary lines – were for a jury to decide.  *Id.* at 486–88.  As the majority candidly explains, *Jackalow*'s reasoning could be read to apply here, too, requiring the government to prove at trial all facts necessary to establish that FCI Petersburg falls within special territorial jurisdiction under 18 U.S.C. § 7(3).  Maj. Op. at 15.  The majority ultimately reads *Jackalow* more narrowly, confining it to the venue context in which it arose, in part because of the Supreme Court's subsequent decision in *Jones*.  Maj. Op. at 16 ("What's more, Supreme Court decisions after *Jackalow* contradict Perez's reading of that Civil War-era decision.").  I am inclined to read it more broadly, in part because I make less of *Jones* than the majority does.

But I will match the majority's candor with my own:  I am perfectly content to leave *Jackalow* – and most of these older cases – as a draw.  Since they were decided, the Supreme Court has come to embrace as a near bright-line rule that every element of a criminal offense, including jurisdictional elements, must be proven at trial beyond a reasonable doubt.  *See Gaudin*, 515 U.S. at 510; *Torres*, 578 U.S. at 467; *see also Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

48

and proved beyond a reasonable doubt.").  It is enough for me that nothing in earlier cases unambiguously requires us to depart here from this more modern command.

In sum, I take the same view of this case as the government did at trial:  Under the Constitution, the prosecution was required to prove, at trial, the facts necessary to satisfy one of 18 U.S.C. § 1466A(d)'s jurisdictional elements.  If it wanted to establish that FCI Petersburg was within the special territorial jurisdiction of the United States under the correct legal standard – that laid out in § 7(3) – then it was required to prove if and when the government acquired the property on which the prison sits.  Because the prosecution, as all agree, failed to do that, Perez is entitled to a judgment of acquittal.

**B.**

That leaves Federal Rule of Evidence 201, and the distinction between adjudicative and legislative facts on which the government and the majority rely.  On my view, of course, this is something of a non-issue; if the Constitution required the prosecution to prove the facts around FCI Petersburg's acquisition at Perez's trial, as I believe it did, then the terms of Rule 201 are beside the point.  But for the government and the majority, and the other courts adopting their view, whether those facts are adjudicative or legislative matters very much.  Rule 201 governs only adjudicative facts, not legislative facts, *see* Fed. R. Evid. 201(a), and to "safeguard[] the criminal defendant's Sixth Amendment right to a trial by jury," it bars courts from taking conclusive judicial notice of adjudicative facts in criminal trials.  *Bello*, 194 F.3d at 25; Fed. R. Evid. 201(f) (requiring court in criminal case to instruct "jury that it may or may not accept [a] noticed fact as conclusive").  So for the government's theory of judicial notice to work, the facts in question here must be

49

legislative and not adjudicative.  *See* Maj. Op. at 19; *Silvers*, 129 F.4th at 343; *Davis*, 726 F.3d at 365–67.

The distinction between legislative and adjudicative facts is notoriously slippery. *See* Haley N. Proctor, *Rethinking Legislative Facts, Rethinking Legislative Facts*, 99 Notre Dame L. Rev. 955, 957, 975 (2024) (explaining that line-drawing in this area has "proven uncommonly difficult").  But here, too, my view is different than the majority's.  Some of this follows directly from my understanding of the constitutional issue in this case:  I would not adopt a reading of Rule 201 that puts it on a collision course with the Constitution's requirements for factfinding in criminal adjudications.  But even on its own terms, I have serious doubts about the majority's view of what counts as a "legislative" fact, subject to judicial notice at any time – even on appeal of a criminal conviction – and outside the constraints of Rule 201.

1.

For the government and the majority, what makes the facts related to the United States' acquisition of FCI Petersburg "legislative" is primarily their characteristics.  Facts involving "established truths" that "do not change from case to case but apply universally," like whether and when the United States acquired the land under FCI Petersburg, are legislative and not adjudicative.  *See* Maj. Op. at 20 (quoting *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976)); *see also* Br. of United States at 23 ("[A]djudicative facts focus on a defendant's acts whereas legislative facts touch on broader non-case-specific matters.").

50

Our circuit has not adopted that test, but others have, some in this very context. *See, e.g.*, *Davis*, 726 F.3d at 366. This characteristic-based approach, however, has been widely criticized. It can be hard to conceptualize or identify the innate features of a fact. *See* 21B *Wright & Miller's Federal Practice and Procedure* § 5103.2 (2d ed. 2025) ("*Federal Practice and Procedure*") ("[S]ometimes judicial definitions wrongly suppose that 'legislative facts' have some intrinsic quality that can be used to identify them."). Facts that can be described as universal also can be "restated in ways that are both particular and concrete," so that how a court chooses to formulate a finding may "alter [the] procedural limits" that apply. Proctor, *supra*, at 979. And perhaps most important, there is "no obvious place to draw a line beyond which a fact becomes general enough to be legislative." *Id.*

In my view, this is a case in point. Without a principled stopping point, the government's conception of what counts as a legislative fact sweeps broadly indeed. Consider, again, the felon-in-possession statute, 18 U.S.C. § 922(g)(1). We, like the government, take for granted that to satisfy § 922(g)(1)'s jurisdictional element, the government must prove at trial that a defendant's gun "has previously traveled in interstate or foreign commerce." *Ervin*, 131 F.4th at 260; *see also, e.g.*, *Gallimore*, 247 F.3d at 136, 138; *United States v. Smoot*, 690 F.3d 215, 222–23 (4th Cir. 2012).[6] But why? A gun's

---

[6] Indeed, we have held that a § 922(g)(1) defendant who refuses to stipulate to a gun's past movements across state lines puts the government to a burden of proof at trial so substantial that he may forgo any credit for acceptance of responsibility. *United States v. Cheatwood*, No. 22-4652, 2025 WL 18098, at *5, *7 (4th Cir. Jan. 2, 2025) (affirmed by unpublished per curiam opinion after oral argument).

51

history at the time it is possessed by a defendant is an "established truth" that "appl[ies] universally," Maj. Op. at 20; where a gun was manufactured and sold does not change from case to case, and whether it has previously crossed state lines often will have nothing to do with "a defendant's acts," *see* Br. of United States at 23; *cf.* Maj. Op. at 23 n.9.  Moreover, our practice of "tasking a jury" with determining a gun's jurisdictional status leaves open the same possibility that worries the government and the majority here:  If two defendants were charged under § 922(g)(1) with possession of the same gun, juries could reach "conflicting decisions as to federal jurisdiction over an identical [firearm] – a status which by its nature either exists or doesn't exist."  Maj. Op. at 23.[7]

Or consider this very case.  Recall that at Perez's trial, the government sought to prove, beyond a reasonable doubt, that the photocopier used by Perez had travelled through foreign commerce, as an alternative means of satisfying the 18 U.S.C. § 1466A jurisdictional element.  But where the photocopier was manufactured and put together is also an unchanging and "universal" fact that would apply in any case involving its illegal use at FCI Petersburg, and it has nothing to do with Perez's actions.  If the government's theory is right, then it might have saved itself a lot of time and effort – and us the 300 pages

---

[7] At oral argument, the government indicated some receptiveness to the idea that its theory might also relieve it of the need to prove a gun's movement in interstate or foreign commerce under § 922(g)(1).  In a subsequent 28(j) letter, however, the government clarified that it was not taking the position that a gun's movement in commerce is a "legislative fact" that may be judicially noticed in a § 922(g)(1) prosecution.  But to my mind, at least, it provided no persuasive ground for distinguishing § 922(g)(1)'s jurisdictional element from the one before us today.  And I would not be surprised if the government, once we adopt its position in this case, were to reconsider and seek to apply the same logic to the jurisdictional element of § 922(g)(1) and other criminal statutes.

of documents – by simply presenting the district court with the actual serial number of the photocopier and asking the court to take judicial notice that it was assembled overseas.

I could go on, but there is no need to belabor the point. If all facts that can be characterized as "universal" count as legislative and not adjudicative, there is no easy way to cabin the results. And it is not just that whatever facts fall within this capacious "legislative" bucket can be judicially noticed. Because those facts are not adjudicative, they also can be judicially noticed free of any constraint under Rule 201. And that presents a whole second order of problems.

Rule 201 does more than preclude conclusive judicial notice of adjudicative facts in a criminal trial. It also guarantees a criminal defendant the right to be heard "on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e); *see Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (internal quotation marks and citation omitted)). And it limits judicial notice of adjudicative facts to those that are "not subject to reasonable dispute" because they are "generally known" or can be "accurately and readily determined" from sources of unimpeachable accuracy. Fed. R. Evid. 201(b).

But none of that applies to legislative facts. No matter how genuinely and reasonably disputed a fact on which FCI Petersburg's jurisdiction rests, a court may take judicial notice, and it may do so by reference to sources whose accuracy is also reasonably disputed. It could do so without first giving a criminal defendant a meaningful opportunity to object. And because, as the majority explains, Rule 201 has no application to legislative

53

facts, there also is room for a court of appeals to take judicial notice of a legislative fact in the first instance – even after a purported conviction in a criminal case. *See* Maj. Op. at 20; *Davis*, 726 F.3d at 367–68 (adopting same position).

Again, this case provides all the example that is needed. Perez was convicted at the end of his bench trial. But as of now, as everyone agrees, the jurisdictional element of his offense has yet to be proven. To fix that defect, the government asks us to analyze, for the first time on appeal, over 300 exceedingly dense pages of documents, which it produced as an attachment to its appellate brief and with an accompanying motion for judicial notice. Those documents were never presented to a trial court, authenticated, or admitted into evidence. Perez saw them for the first time when the government filed its appellate brief, and had only the time – and page-limited opportunity provided by an appellate reply brief to respond – which he used to raise what appear to be genuine questions about the documents' import. Reply Br. of Appellant at 19 (describing questions raised by fact that "according to the plat maps and deeds, the United States acquired different parcels at different time[s] and in different ways, which it combined to form first Camp Lee, and then subdivided later to convey to BOP to build and operate FCI Petersburg"). And were we to take the government up on its invitation, we would be effectively convicting Perez on appeal, notwithstanding his absence from our appellate proceedings. *Cf. United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (discussing constitutional right of defendant to "be present at a proceeding whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against a charge") (internal quotation marks and citation omitted); Fed. R. Crim. P. 43(a)(2).

54

I appreciate the majority's decision not to exercise what it views as its discretion to take judicial notice, on appeal, of the facts necessary to satisfy the jurisdictional element of Perez's offense, and instead to remand to the district court for a first assessment. Maj. Op. at 30. And I hope the district court, mindful of the criminal context, will exercise its discretion to provide at least some of the protections contemplated by Rule 201. But all of this is a matter of discretion. As the majority recognizes, its generous understanding of legislative facts would allow future appellate panels to go ahead and decide, post-conviction, whether every element of a criminal offense has been satisfied, even if that means wading through unauthenticated documents produced for the first time on appeal, looking for an answer that is not obvious on their face. *Id.* For me, that is reason enough to be concerned about its proposed definition of legislative facts.

## 2.

There is an alternative approach to defining legislative facts, focused not on a fact's supposed innate characteristics but on the use to which it is being put. *See, e.g., Federal Practice and Procedure, supra*, § 5103.2 & nn.17–18 (facts' status as legislative or adjudicative should depend on "the use to which they are put in the case, not by what they are like in the wild"). Under this functional standard, a fact used in a legislature's lawmaking process or a court's legal reasoning – to determine the meaning of a law, say, or to "formulat[e] a legal principle" – is a "legislative" fact. *See* Fed. R. Evid. 201(a) Advisory Committee Note (describing legislative facts). A fact that relates to a particular case – one "to which the law is applied in the process of adjudication" – is an adjudicative fact, subject to the limits of Rule 201. *Id.* (internal quotation marks and citation omitted).

55

In *Bello*, the First Circuit applied this functional approach to the same question in front of us today: Are the facts necessary to show the jurisdictional status of a federal prison under 18 U.S.C. § 7(3) legislative or adjudicative? 194 F.3d at 22–23. The court outlined the test as follows: "Whether a fact is adjudicative or legislative depends not on the nature of the fact – e.g., who owns the land – but rather on the use made of it (*i.e.*, whether it is a fact germane to what happened in the case or a fact useful in formulating common law policy or interpreting a statute) and the same fact can play either role depending on context." *Id.* at 22. And it had little difficulty applying that standard, concluding that "[w]here the prison sits is an element of the offense and unquestionably an adjudicative fact." *Id.* at 23.[8]

I agree. The facts we are being asked to judicially notice on appeal – including whether and when the federal government acquired the land on which FCI Petersburg sits – are not facts being used to make law, but facts "to which the law is applied in the process of adjudication." Fed. R. Evid. 201(a) Advisory Committee Note (internal quotation marks and citation omitted). The legal question, again, is the meaning of "special territorial jurisdiction" as used in 18 U.S.C. § 1466A(d) – which we now know tracks the factors laid out in § 7(3). Whether and when the government acquired FCI Petersburg's land is a fact

---

[8] The *Bello* court sustained the defendant's conviction because the district court followed Rule 201's direction and left the final determination of the prison's jurisdictional status to the jury, instructing it that it need not accept the noticed facts as conclusive. 194 F.3d at 25. Whether that mechanism is sufficient to protect a defendant's Fifth and Sixth Amendment rights, and how it would apply in a bench trial like this one, is not before us today, on Perez's purely constitutional claim.

56

to which that standard, now undisputed, will be applied, to ascertain whether § 1466A(d)'s jurisdictional element has been satisfied.  In holding those facts up against the legal standard, in other words, the factfinder will be engaged in "law *application*," not the making of law.  Proctor, *supra*, at 1004 (emphasis added).[9]

In my view, this approach has distinct virtues.  Most obviously, it heads off a conflict with the Constitution's requirements for factfinding in criminal cases, by deeming "adjudicative" the same facts that must be found by a jury beyond a reasonable doubt under the Fifth and Sixth Amendments – those necessary to satisfy an element of the offense.  It also relieves courts of the metaphysical task of pinning down a fact's inherent nature or characteristic, substituting a more functional approach recognizing that a fact's coloration can change with the use to which it is put.  *See Bello*, 194 F.3d at 22 (explaining that the same fact can be legislative and adjudicative "depending on context").  I am under no illusion that this approach, or any other, can eliminate all the complexities or edge cases when it comes to distinguishing legislative from adjudicative facts.  But on balance, I think the First Circuit's approach has the most to commend it.

Finally, to the extent the majority argues that our own precedent compels a different result, I disagree.  Indeed, as the majority recognizes, Maj. Op. 22–25, at least one of our

---

[9] The majority also refers to this more functional standard once or twice.  *See* Maj. Op. at 20 ("Courts judicially notice [legislative facts] when assessing the constitutional validity of, or interpreting, a statute.").  But I understand the majority to apply it only in connection with its determination – with which Perez and I agree – that some portion of the § 7(3) analysis will involve the evaluation of state and federal statutes, and that such materials are undoubtedly legislative facts that can be noticed on appeal.  Maj. Op. at 20–21.

57

prior decisions can be read as embracing the proposition that facts related to a jurisdictional element are adjudicative, not legislative. In *United States v. Burroughs*, 564 F.2d 1111, 1115 n.7 (4th Cir. 1977), *abrogated on other grounds by United States v. Steed*, 674 F.2d 284, 285 n.2 (en banc), we refused to "take judicial notice on appeal of an unproven essential element of a criminal offense." If, as the majority would have it, whether the defendant's use of a telephone satisfied an interstate commerce jurisdictional element rested on legislative rather than adjudicative facts, then Rule 201 would pose no obstacle to taking judicial notice of those facts on appeal.

The majority puts more weight on *United States v. Lavender*, 602 F.2d 639, 641 (4th Cir. 1979), in which we indeed seem to have taken judicial notice, on appeal, that the Blue Ridge Parkway falls within the special territorial jurisdiction of the United States – something we should not have done if that fact is adjudicative and thus covered by Rule 201. At the same time, however, the court was clear that it could do so because the relevant facts were "commonly known," *id.* – a requirement for notice of *adjudicative* facts under Rule 201(b). Beyond that, the *Lavender* court never grappled with Rule 201, nor with the three-factor standard for proving special territorial jurisdiction under 18 U.S.C. § 7(3). So I would not put as much weight on *Lavender* as the majority does. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) (declining to treat as conclusive cases where an issue is "not presented or even envisioned").

I think it is fair to say, though, that our case law is a bit opaque and perhaps not entirely consistent on the question at hand: whether facts being used to prove a

58

jurisdictional element of a criminal offense are legislative or adjudicative under Rule 201.[10]

That issue appears to have been rarely, if ever, pressed directly by litigants or carefully

analyzed by our court. But while a lack of opportunity for close examination may have

generated some tension in our precedent, I see nothing that would foreclose the First

Circuit's functional approach, and for the reasons given above, I believe it is the sounder

option.

### III.

As I said at the start, this is a difficult question on which several courts have adopted

the position of the government and the majority, and I fully respect the majority's careful

and candid analysis. In my view, though, the answer to the case becomes clear when it is

stripped down to its essentials: The prosecution was required by the Constitution to prove

at trial, beyond a reasonable doubt, all facts necessary to satisfy the jurisdictional element

of the offense with which Perez was charged. It tried to do so and failed twice over. As a

result, Perez is entitled to a judgment of acquittal. For that reason, I respectfully dissent.

---

[10] As I have noted before, that question – how best to read and apply Rule 201 – is of course separate from the constitutional question of whether the Fifth and Sixth Amendments require the prosecution to prove beyond a reasonable doubt the facts necessary to satisfy the jurisdictional element of a criminal offense. In my view, as discussed above, the Supreme Court has made clear, since the time of *Burroughs* and *Lavender*, that whatever the dictates of Rule 201, every fact necessary to satisfy any element of a criminal offense must be proved beyond a reasonable doubt by the prosecution at trial. *See Gaudin*, 515 U.S. at 522–23; *Torres*, 578 U.S. at 467. But the scope of Rule 201 is critical to the government's theory and is important in its own right.